685 So.2d 357 (1996)
STATE of Louisiana
v.
Louie M. SCHEXNAYDER.
No. 96-KA-98.
Court of Appeal of Louisiana, Fifth Circuit.
November 26, 1996.
*361 Jack M. Capella, District Attorney, Terry M. Boudreaux, Assistant District Attorney, Louise Korns, of counsel, Gretna, for Plaintiff/Appellee.
Linda Davis-Short, Staff Appellate Counsel, Gretna, for Defendant/Appellant.
Before GAUDIN, DUFRESNE, and GOTHARD, JJ.
GOTHARD, Judge.
On December 1, 1994, the Jefferson Parish Grand Jury issued a bill of indictment charging co-defendants, Louie Schexnayder and Dennis Morales, with second degree murder, in violation of LSA-R.S. 14:30.1. Defendant herein, Louie Schexnayder, was arraigned on December 9, 1994, and pled not guilty.
Defense counsel filed various pretrial motions, including motions to suppress confession, identification and evidence. The trial court heard the motion to suppress identification on April 19, May 4, and June 13, 1995, and denied the motion on June 13. It does not appear from the record that the other motions were heard or otherwise disposed of by the court prior to trial. Defendant also filed a motion to quash and a motion to dismiss counsel, both of which were denied by the court on June 15, 1995.
Trial commenced as to both defendants on June 19, 1995. On the third day of trial, Schexander moved for and was granted a mistrial. On June 22, 1995, defense counsel filed a motion to sever parties. The motion to sever was apparently granted, but the record is not clear as to when this occurred. Defense counsel filed a motion to quash the prosecution on June 27, 1995, alleging prosecutorial misconduct and double jeopardy. Defendant filed a pro se motion to quash the indictment on June 30, 1995, alleging a conspiracy between his trial counsel and the prosecutor. On July 6, 1995, defendant filed a pro se motion to suppress evidence. The trial judge denied all three motions on July 10, 1995.
The State proceeded to trial against defendant, Louie Schexander, on July 17, 18 and 19, 1995. On July 19, the jury returned a verdict of guilty as charged by a vote of ten to two. After the rendering of the verdict, defense counsel filed an oral motion for appeal. On August 14, 1995, defendant filed a pro se motion for new trial. Defense counsel filed a motion for new trial on September 6, 1995. Both new trial motions were denied.
On October 5, 1995, the court sentenced defendant to a term of life imprisonment at hard labor, without benefit of parole, probation, or suspension of sentence with credit given for time served. Defendant filed a timely motion for appeal, which was granted.

FACTS
On the night of October 24, 1994, Arthur Williams and his girlfriend, Diane Bush, were on the front porch of their home in Kenner. At about 10:20, they saw a neighbor, Eugene Price, walking down the street on his way home. Both Williams and Bush testified that Price appeared to be intoxicated. Williams suggested to Bush that she go inside and put on her shoes so they could walk to a friend's house. Ms. Bush complied.
Williams testified that Price reached the sidewalk in front of his house when a car drove by at a high rate of speed. The car stopped short, and backed up until it was next to Price. Defendant, whom Williams knew by sight, exited the car and walked around the back toward Price. The car's passenger, whom Williams recognized as Dennis Morales, remained in the vehicle.
Williams testified that defendant approached Price, addressed some profanities to him, and appeared to punch him in the chest. In an attempt to deter further violence, Williams left the porch and confronted defendant. Defendant turned toward Williams in a threatening manner, then got back in the car and drove away.
Williams approached Price, saw that he was bleeding, and realized he had been stabbed. Price continued to walk for a distance *362 of three or four houses before he collapsed. Williams called out to a neighbor to call 911.
Ms. Bush, who returned to the porch in time to witness the entire incident, testified that she was unable to see the perpetrator's face. She went to Price's mother-in-law's house nearby in search of help, but there was no answer when she knocked on the door. Williams and Bush sought the help of another neighbor, a nurse, who went to assist Price. Price later died from his injuries.
When officers with the Kenner Police Department arrived at the scene of the murder, Williams gave them descriptions of the two perpetrators. Williams also described the car as a brown or tan older model Oldsmobile, possibly a Delta 88 or 98. While at the scene, Detective Mark Ortiz saw a car some distance away traveling at a slow speed with its headlights off. When the car turned in the direction of Veterans Boulevard, Ortiz noted that it fit the description given by Williams. Ortiz, along with Detective Keith Pepitone, went in an unmarked police unit to search for the car.
Later, the detectives spotted the car in an area known as University City, where Williams had told them one of the perpetrators lived. The officers followed the car to the eastbound Loyola Drive entrance ramp to Interstate 10. The officers turned on flashing lights, alerting the suspects to pull over. Defendant, who was driving the car, complied. The officers ordered defendant and Morales out of the car. Both men were patted down for weapons, but none were found. The officers also detained a female passenger, Tiffany Rickman.
Ms. Rickman testified at trial that she had been in defendant's car only five minutes before the officers stopped them, and knew nothing of the murder. She stated that when the two men became aware that they were being followed by police, she heard one of them tell the other to "get rid of it." She did not, however, see them dispose of anything.
Detective Pepitone contacted Detective Bill Murrett, who was still at the murder scene, and asked that he transport Mr. Williams to Loyola Drive to make a possible identification. Murrett took Williams in an unmarked police car to the location where defendant and Morales had been apprehended. While still sitting in Murrett's car, Williams made spontaneous identifications of defendant's car and of defendant and Morales. Defendant and Morales were placed under arrest. Ms. Rickman and Mr. Williams were transported to the police station for further questioning.
The officers searched the area around defendant's car for the murder weapon, but were not able to find anything of evidentiary value. Police impounded defendant's car and obtained a search warrant for it, but no evidence was seized during the subsequent search.

ASSIGNMENTS OF ERROR
On brief to this Court, defendant assigns nine errors for our review. In the first assignment he argues that the trial court erred in refusing to allow him to exercise a peremptory challenge during the selection of the jury. Defendant complains that the trial court erred in sustaining the State's objection to one of his peremptory challenges during jury selection. Defendant argues that, because the court did not allow him to remove a prospective juror, he was deprived of a fair trial and an impartial jury.
During voir dire, the State objected to defense counsel's peremptory challenge of prospective juror, Waveland Trufant, on the grounds that counsel had systematically used peremptory challenges to exclude all black venirepersons. The following colloquy ensued:
THE COURT: You have to explain why. Look, every answer she gave is totally vanilla. Why are you knocking her out?
MR. SOIGNET [defense counsel]: I just don't feel comfortable with her.
MS. WICKER: That's not good enough.
THE COURT: You're going to have to come up with a better one than that, because if that's what she said, you would not let her go on that.

*363 MR. SOIGNET: I've selected people from all races, because some of them I don't feel good with
THE COURT: What did she say?
MR. SOIGNET: She didn't say anything, that's not the reason.
THE COURT: What other aspect
MR. SOIGNET: I just felt that she was, just as you say, vanilla, I never got any, any feel how she felt about sitting as a juror and I just don't feel comfortable with her. I mean, that's my opinion.
THE COURT: Because she's black has nothing to do with it at all?
MR. SOIGNET: No, absolutely not.
The prosecutor pointed out to the court that the defense counsel had used peremptory challenges to strike every African American who was not removed for cause. The trial judge agreed with the prosecutor and further noted that the victim was black and the defendant is white. Defense counsel countered that one black juror had been chosen, and reiterated his assertion that his objection to Ms. Truant was not racial. Defense counsel subsequently added, "Okay, Your Honor, the only thing I'm going to say is the only rational reason I have is I have no good feeling toward her and I don't want her on the jury." The trial judge denied defense counsel's peremptory challenge, and ordered that Ms. Trufant be seated on the jury.
Equal protection guarantees that criminal defendants have the right to be tried by a jury selected by nondiscriminatory criteria. U.S. Const. Amend. 14; Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). It is well established that the State's use of peremptory challenges based solely on a juror's race is prohibited. Id. In Georgia v. McCollum, 505 U.S. 42, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992), the Supreme Court extended Batson to hold that a criminal defendant may not violate the equal protection rights of venirepersons solely because of race. See also State v. Knox, 609 So.2d 803 (La. 1992).
Whenever a prosecutor or defense counsel makes a Batson objection, he/she must first make a prima facie showing that the other party has exercised peremptory challenges on the basis of a juror's cognizable racial background. In determining whether there exists a case of purposeful discrimination, the trial judge should consider all relevant circumstances, including any pattern of strikes against minority jurors, and any questions or statements during voir dire examination or in the exercise of peremptory challenges which may support or refute an inference of purposeful discrimination. Batson v. Kentucky, 476 U.S. at 98, 106 S.Ct. at 1722-1723; State v. Collier, 553 So.2d 815, 819 (La.1989). See also, State v. Durham, 94-1036 (La.App. 5 Cir. 4/16/96), 673 So.2d 1103, 1110.
The Batson criteria are codified in LSA-C.Cr.P. art. 795, which provides:
C. No peremptory challenge made by the state or the defendant shall be based solely upon the race of the juror. If an objection is made that the state or defense has excluded a juror solely on the basis of race, and a prima facie case supporting that objection is made by the objecting party, the court may demand a satisfactory racially neutral reason for the exercise of the challenge, unless the court is satisfied that such reason is apparent from the voir dire examination of the juror. Such demand and disclosure, if required by the court, shall be made outside of the hearing of any juror or prospective juror.
D. The court shall allow to stand each peremptory challenge exercised for a racially neutral reason either apparent from the examination or disclosed by counsel when required by the court. The provisions of Paragraph C and this Paragraph shall not apply when both the state and the defense have exercised a challenge against the same juror.
E. The court shall allow to stand each peremptory challenge for which a satisfactory racially neutral reason is given. Those jurors who have been peremptorily challenged and for whom no satisfactory racially neutral reason is apparent or given may be ordered returned to the panel, or the court may take such other corrective action as it deems appropriate under the circumstances. The court shall make specific *364 findings regarding each such challenge.
On appeal, defendant argues the trial court did not establish a prima facie case of purposeful discrimination. We disagree. The trial court noted the pattern of elimination of black jurors, excluding all but one from the panel. Further, the court considered the relevant fact that the victim was black and the defendant white. Given these circumstances, we find the prosecutor established a prima facie case of systematic exclusion of black jurors.
If a prima facie case is established, the burden shifts to the party who has made the peremptory challenges to articulate a race-neutral explanation for striking the jurors in question. Finally, the trial court must determine whether the party raising the objection has carried his burden of proving purposeful discrimination. Purkett v. Elem, ___ U.S. ___, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995); Hernandez v. New York, 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991); Batson v. Kentucky, 476 U.S. at 96-98, 106 S.Ct. at 1722-1724; State v. Green, 94-0887 (La.5/22/95), 655 So.2d 272.
In evaluating the race neutrality of an attorney's explanation, a court must determine whether, assuming the proffered reasons for the peremptory challenges are true, the challenges violate the Equal Protection Clause as a matter of law. A court addressing this issue must keep in mind the fundamental principle that "official action will not be held unconstitutional solely because it results in a racially disproportionate impact... Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 264-265, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977); see also Washington v. Davis, 426 U.S. 229, 239, 96 S.Ct. 2040, 2047, 48 L.Ed.2d 597 (1976). Hernandez v. New York, 500 U.S. at 358, 111 S.Ct. at 1866. A neutral explanation is, in effect, one which is based on "something other than the race of the juror." Id.
In Purkett v. Elem, supra, the United States Supreme Court held that a race-neutral explanation offered by the party using a peremptory challenge need not be persuasive, or even plausible. Persuasiveness of the justification only comes into play in the third step of the Batson analysis, when the trial court determines whether the opponent of the challenge has carried his burden of proving purposeful discrimination. Quoting the decision in Hernandez, the Elem court found that, "[a]t this [second] step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." ___ U.S. at ___, 115 S.Ct. at 1771.
The third step under Batson is to determine whether the complaining party has met its burden of showing purposeful discrimination on the part of opposing counsel. The proper question at this stage is whether the proof offered by the objecting party, when weighed against opposing counsel's proffered "race-neutral" reasons, is strong enough to persuade the trier-of-fact that the claimed discriminatory intent is present. State v. Green, 655 So.2d at 290; State v. Durham, 673 So.2d at 1112.
Defense counsel's explanation for his peremptory challenge may be considered race neutral, but it is not particularly persuasive. Counsel's explanation that he was simply not comfortable with Ms. Trufant is practically no reason at all. There is nothing apparent in the record to support counsel's argument that she was objectionable. In response to voir dire questioning, Ms. Trufant stated she was not employed and had never been a victim of crime. She told the judge she was divorced, had two children, and had no prior jury experience.
While the record is not absolutely clear, it is sufficient to support the court's finding that the State proved a pattern of purposeful discrimination on the part of defense counsel. It is also noted that the trial court had the advantage of observing the characteristics and demeanor of the attorneys and the prospective jurors firsthand. This Court has held a trial judge's rulings regarding discriminatory jury selection are entitled to great *365 deference, and are not overturned absent a finding of manifest error. State v. Durham, supra 673 So.2d at 1112; State v. Spencer, 93-571 (La.App. 5 Cir. 1/25/94), 631 So.2d 1363, 1366-1367, writ denied, 94-0488 (La.2/3/95), 649 So.2d 400. We find no manifest error in this case.
In his second assignment, defendant asserts that the trial court erred in denying his motion to quash based on the State's destruction of evidence and failure to take photographs. By this assignment, defendant complains that the State destroyed his automobile impounded by police at the time of his arrest, and thereby deprived him of access to important exculpatory evidence. Detective Bill Murrett testified at trial that, after defendant was arrested, his automobile was impounded by police. Officers obtained a search warrant and conducted an inventory search of the vehicle. Detective Murrett, who was present during the search, testified that no evidence was seized, and no photographs were taken of the car. Murrett further testified that defendant's car was later destroyed. Defendant filed a pretrial motion to quash the indictment, arguing that the destruction of this evidence irreparably prejudiced his case. The trial court denied the motion.
Defendant argues that the witnesses' descriptions of the car involved in the murder were integral to the issue of identification in this case. He asserts that witnesses, including Arthur Williams, described the car as brown in color, when it was actually gold. Defendant concludes that, because he was not able to use the car or photographs of the car as evidence, he was deprived of the opportunity to effectively impeach the testimony of the State's witnesses.
Due process requires that the State provide a defendant with any exculpatory evidence in its possession which is material to defendant's guilt or punishment, regardless of the good faith or bad faith of the prosecutor. Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); State v. Johnson, 426 So.2d 95 (La.1983). Where a defendant claims that his due process rights have been violated due to the State's failure to preserve potentially useful evidence, the defendant has the burden of showing that the State acted in bad faith. Arizona v. Youngblood, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988); California v. Trombetta, 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984); State v. Lindsey, 543 So.2d 886 (La.1989).
The court in Trombetta, 467 U.S. at 488-489, 104 S.Ct. at 2534, stated:
Whatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality, ... evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.
In this case, defendant does not offer sufficient proof that the State acted in bad faith in destroying the car. Trial testimony shows that the Kenner Police Department was not in possession of the car at the time it was destroyed. Detective Murrett testified that the department does not have storage facilities for the automobiles it confiscates, and routinely stores them with a wrecker company. It is not standard department procedure to photograph vehicles before sending them to the wrecker company.
Ms. Wanda Childs, who keeps records at Moon's Wrecker Service, testified that her company initially towed defendant's car, a 1978 tan Oldsmobile Delta 88, on October 25, 1994. It was picked up at I-10 and Loyola and brought to 1801 Williams Boulevard in Kenner. The car was sent back to the police department on October 28, and was received by Moon's again on November 2. Upon receiving the car, Moon's followed its standard procedure by immediately setting into motion the paperwork necessary for selling or destroying the vehicle. In compliance with State law, the company sent certified letters to defendant on November 15, 1994, and November 29, 1994, notifying him that if he did not claim his vehicle, it would be destroyed. *366 A notice of destruction, postmarked December 1, 1994, was sent to defendant. On March 28, 1995, Moon's received a permit from the State authorizing the company to destroy the car. It is clear that the State used standard operating procedures in the handling defendant's car, and there is no evidence the police department or the prosecutors acted in bad faith. Indeed, Ms. Childs testified that defendant or his representatives would have been allowed to examine or photograph the car at any time over the five month period the car was stored at Moon's. Further, the vehicle could have been claimed at any time upon payment of the storage fee. According to Ms. Childs, no one representing defendant asked to see the car while it was stored at Moon's.
Defendant claims that he could have used the car at trial to impeach Arthur Williams' identification testimony. We find that argument unconvincing. Williams made a positive identification of defendant and the car shortly after the murder at the scene of the arrest, and was also able to make a positive in-court identification of defendant. Defendant does not show that the car had exculpatory value that was apparent prior to its destruction.
It was not necessary that he have either the car or photographs of it to prove the color. Defendant could have used other evidence, such as automobile registration records or testimony of individuals who were familiar with the car for such proof. In fact, Ms. Childs testified on cross-examination that the car's color was listed as gold on an appraisal. Also, Joann Romano testified the car was tan/gold in color. Considering the evidence in light of the Supreme Court's analysis in Trombetta and Youngblood, we find no error in the trial court's denial of defendant's motion to quash. This assignment of error is without merit.
In his third assignment, the defendant argues that the trial court erred in allowing the State to introduce statements made by Dennis Morales to Joann Romano at defendant's trial. Defendant complains that the trial court erred in allowing State's witness, Joann Romano, to testify about a statement Dennis Morales made to her during a telephone conversation. Ms. Romano testified at trial that at the time of the murder she was dating defendant. At about seven or eight o'clock on the night of October 24, defendant and Dennis Morales arrived at her house in defendant's car. They stayed at the house for an hour to ninety minutes, and left at about 9:30 P.M.
After defendant and Morales were arrested for the murder of Eugene Price, Morales telephoned Ms. Romano from jail. He told her to tell anyone who asked that he and defendant were at her house at the time of the murder. Defendant called her from the jail the following day, and told her that if Morales called her again, she should tell him to stay calm and everything would be okay. On the advice of her attorneys, Ms. Romano had no further contact with either defendant or Morales.
Before Ms. Romano took the stand, the court heard arguments regarding the admissibility of these statements. The prosecutor argued that the statements were admissible under LSA-C.E. 801(D)(2) and (3). The prosecutor specifically urged that Morales' statement was admissible as a statement by a co-conspirator. Defense counsel objected to the admission of the testimony, arguing that it was hearsay. The court overruled the objection, reasoning that Ms. Romano's conversation with Morales fell under Article 801(D)(2)(c). That section provides that a statement is a non-hearsay "admission" if it is offered against a defendant, and is made by a person authorized by him to make such a statement on the subject. Official Comment (d) to Article 801(D)(2)(c) indicates that this subsection is based on traditional agency principles, and covers statements classified as "representative" or "vicarious" admissions.
The testimony related to Morales' telephone call is not governed by 801(D)(2)(c). It is clear that Morales' statement to Romano was not authorized by defendant, as is required under subsection (c). Romano testified that Morales told her he and defendant were separated in jail, and thus had not been in contact. It must then be considered whether Romano's testimony *367 concerning her conversation with Morales was indeed inadmissible hearsay.
Hearsay is defined as "a statement, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted." LSA-C.E. art. 801(C). Unless otherwise authorized by the Code of Evidence or other legislation, statements constituting hearsay are inadmissible as evidence. LSA-C.E. art. 802. In State v. Brown, 562 So.2d 868, 877 (La.1990), the Louisiana Supreme Court explained as follows the intent behind the hearsay rule:
Hearsay is excluded because the value of the statement rests on the credibility of the out-of-court asserter who is not subject to cross-examination and other safeguards of reliability. State v. Martin, 458 So.2d 454 (La.1984). However, when an extrajudicial declaration or statement is offered for a purpose other than to establish the truth of the assertion, its evidentiary value is not dependant upon the credibility of the out-of-court asserter and the declaration or statement falls outside the scope of the hearsay exclusionary rule.
The statement Morales made to Ms. Romano over the telephone was certainly an out-of-court statement, and Morales, the declarant, was not available at trial for crossexamination. However, Morales' statement did not include any details of the murder, nor did he admit to any part he or defendant may have played in it. This Court has held that evidence is not hearsay, and thus admissible, if it is introduced to show that the utterance occurred or that the conversation took place rather than to show the truth of the matter asserted. State v. Parker, 506 So.2d 675 (La.App. 5 Cir.1987), writ denied, State v. Tell, 512 So.2d 456 (La.1987). Based on the above reasoning, we find that the statement made by Morales to Romano is admissible. This assignment is without merit.
In his fourth assignment, the defendant argues that the trial court erred in allowing testimony regarding the co-defendant who was not on trial with defendant. Defendant objects to the admission of testimony given by State witness, Quinton Tobor. Defendant complains that Tobor's testimony pertaining to Dennis Morales' activities on the night of the murder was not relevant to this case, since Morales was not tried with defendant.
Quinton Tobor testified at trial that he has known Dennis Morales for two years. Morales routinely carried a buck knife in a leather case hooked to his belt. Tobor never saw Morales without the knife. Morales went to Tobor's house at about 6:00 or 6:30 on the morning of October 24, 1994. Tobor testified that Morales was drunk, and he wanted to borrow money to buy gasoline. Morales waved his knife around, and Tobor told him he should put it away. Morales responded that he carried the knife for protection.
Morales went back to Tobor's house that evening. He was driving a white pickup truck, and was accompanied by a woman. Tobor asked Morales to come back later to give his friend Tiffany Rickman a ride, and Morales agreed. Tobor testified that Morales and another man arrived in an old beige or brown car at around 10:00 that evening.[1] Rickman, who was at that time living with Tobor and his wife, testified that she did not know the men, but accepted a ride from them as Tobor had arranged.
With some exceptions, all evidence which is relevant is admissible. LSA-C.E. art. 402. LSA-C.E. art. 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." LSA-C.E. art. 403 provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time."
Mr. Tobor's testimony was neither a waste of the court's time nor confusing to the jury. The facts to which Tobor testified were consistent with other evidence produced at trial. Although Morales was not tried with defendant, eyewitness testimony established *368 that Morales was with defendant at the time of the murder,[2] and that the murder was committed with a knife. Tobor's testimony that Morales had a knife on the day of the murder corroborates these facts. Considering the foregoing, we find that Mr. Tobor's testimony was relevant, and that its admission at trial did not prejudice defendant's case.
Defendant complains that he was deprived of his constitutional right of confrontation when the trial court denied him the opportunity to cross-examine witness Arthur Williams as to his possible bias or interest.
The Sixth Amendment to the United States Constitution guarantees the right of an accused in a criminal prosecution "to be confronted with the witnesses against him." Additionally, the confrontation clause of the Louisiana State Constitution directly affords the accused the right to "confront and crossexamine the witness against him ...". La. Const. of 1974, Art. I, Sec. 16. The right to impeach a witness for bias or interest is encompassed in the right of confrontation, and is specifically dictated by LSA-C.E. art. 607(D).
LSA-C.E. art. 609.1(B) provides: "Generally, only offenses for which the witness has been convicted are admissible upon the issue of his credibility, and no inquiry is permitted into matters for which there has only been an arrest, the issuance of an arrest warrant, an indictment, a prosecution, or an acquittal." It is noted, however, that "Paragraph B's use of the word `generally' presumably acknowledges the possible use of arrests, indictments and the like where independently relevant to show bias." Handbook in Louisiana Evidence Law, Pugh, Force, Rault and Triche (1996). See also State v. Grace, 94-295 (La.App. 5 Cir. 9/27/94), 643 So.2d 1306, 1308.
During defendant's trial, a bench conference was held out of the jury's presence and before Arthur Williams took the stand. Defense counsel asked the court for authority to cross-examine Williams regarding outstanding attachments on him at the time of Eugene Price's murder. Counsel argued that he wished to show that the Williams' information to the police and his testimony in court were influenced by the State's promise of favorable treatment with respect to the open attachments.
At the pretrial hearing on the motion to suppress identification, Williams testified that at the time of the murder he was on probation. He further testified that there were outstanding attachments for his arrest, but that he did not know about the attachments until Detective Murrett took him to the police station for questioning about the murder. Williams stated that Detective Murrett did not promise him anything in exchange for his statements to police. However, Murrett did tell Williams he would not act on the attachments that night. Murrett testified that he did not promise Williams anything in exchange for the identification. Murrett stated that he discovered the open attachments on Williams after the identification was made.
After hearing that testimony, the judge denied counsel's request, reasoning that prior testimony in the case showed that Williams identified defendant as the murderer and made his statement to detectives before he learned from Detective Murrett that he had an outstanding attachment. The court therefore deemed it improbable that Williams would have cooperated with police in order to ensure favorable treatment with respect to said attachments.
Although Williams and Murrett both testified that there was no agreement made between the State and Williams in exchange for information, Murrett's failure to immediately act on the Williams' attachments might be construed as favorable treatment given in exchange for Williams' continued cooperation. In State v. Vale, 95-1230 (La. 1/26/96), *369 666 So.2d 1070, 1072, the Louisiana Supreme Court summarized as follows its jurisprudence on the defendant's right to cross-examine a witness as to bias or interest:
... to the extent exposure of a witness's motivation is a proper and important function of the constitutionally protected right of cross-examination, a witness's "hope or knowledge that he will receive leniency from the state is highly relevant to establish his bias or interest." State v. Brady, 381 So.2d 819, 822 (La.1980) (collecting cases); see also State v. Nash, 475 So.2d 752, 755-56 (La.1985). A witness's bias or interest may arise from arrests or pending criminal charges, or the prospect of prosecution, even when he has made no agreements with the state regarding his conduct. Id.

Although there was no proof of an overt agreement with the State, defense counsel should have been allowed to question Williams about any expectations he may have had of favorable treatment under the jurisprudence cited in Vale. However, even assuming the trial court improperly restricted defense counsel's cross-examination of Williams, the error was harmless. Appellate courts should not reverse convictions for errors unless the accused's substantial rights have been violated. State v. Johnson, 94-1379 (La.11/27/95), 664 So.2d 94, 100; State v. Nguyen 95-1055 (La.App. 5 Cir.3/26/96), 672 So.2d 988.
Williams' testimony was corroborated by other evidence at trial, including the testimony of Diane Bush. Williams identified defendant shortly after the murder, without any prompting from Detective Murrett. The motion hearing testimony tends to show that neither Detective Murrett nor defendant knew of the open attachments when Williams identified defendant. It is noted that Williams admitted to his prior convictions on direct examination, so the jury was made aware of his criminal past. The record also shows that by the time of defendant's trial, Williams probation had been revoked, he was incarcerated, and he had no pending charges against him. Thus the guilty verdict was surely unattributable to any error which may have occurred when the trial court refused to allow defendant to question Williams concerning his bias.
In the sixth assignment, defendant complains that the trial court erred in ruling that he could not question the witness about the time frame of his convictions. Defendant argues that his constitutional right of confrontation was violated when the trial court denied him the opportunity to cross-examine State's witness Arthur Williams regarding a prior conviction.
During defendant's trial, defense counsel informed the court, out of the jury's presence, that he wished to cross-examine Williams as to the details of his current incarceration.
LSA-C.E. art. 609.1(C) provides:
Ordinarily, only the fact of a conviction, the name of the offense, the date thereof, and the sentence imposed is admissible. However, details of the offense may become admissible to show the true nature of the offense:
(1) When the witness has denied the conviction or denied recollection thereof;
(2) When the witness has testified to the exculpatory facts or circumstances surrounding the conviction; or
(3) When the probative value thereof outweighs the danger of unfair prejudice, confusion of the issues, or misleading the jury.
It appears that counsel wished to elicit from Williams the fact that he was currently incarcerated, and that his current incarceration was the result of a probation revocation. Article 609.1(C) does not allow such questioning under the facts in this case. Williams admitted to his prior convictions under direct examination. Defendant was therefore not prejudiced by the trial court's ruling. This assignment of error is without merit.
In the seventh assignment, defendant argues that the trial court erred in denying his objection to the State's remarks during closing which were a misstatement of the facts, and were outside the evidence presented in defendant's second trial. Defendant particularly complains of the portion of the *370 State's rebuttal argument pertaining to blood testing:
Now, the defense in this case is pretty typical. What we're going to do is we're going to try what State didn't do. Well, I can tell you this, we didn't do DNA in this case, we didn't test Arthur's blood, we didn't test Schexnayder's blood. This isn't O.J. Simpson, we're trying a murder
MR. SOIGNET [defense counsel]:
Your Honor, may I approach for a moment? (Whereupon a brief discussion was held off the record.)
MS. WICKER [prosecutor]:
Once again, ladies and gentlemen, to repeat myself, we didn't do DNA testing, we didn't take Louie Schexnayder's blood, we didn't, we don't have fingerprints, we don't have gun residue, since this isn't a gun case, we don't haveare we going to get up here again, what are we going to do?
COURT:
No.
MS. WICKER:
* * * * * *
Ladies and gentlemen, we don't have to spend a hundred dollars doing DNA testing when an eye witness (sic) who has been asked repeatedly whether or not Louie Schexnayder is the person who stabbed to death Eugene Price. We don't have to do DNA testing costing hundreds of thousands of dollars. This is real life, ladies and gentlemen, this is not razzle dazzle fruits and nuts.
At the conclusion of the State's rebuttal argument, defense counsel objected out of the jury's hearing to the State's mention of DNA testing. He argued that the State's assertion that defendant's blood had not been tested was incorrect. The judge denied the objection, stating that her notes reflected that the serologist had testified that no blood testing had been done on defendant. The record in this case does not show that the serologist, Charles Krone, testified at defendant's second trial. Krone did testify at defendant's first trial (which ended in mistrial). However, the transcript of Krone's testimony at the first trial does not show that samples of defendant's blood were either taken or tested. Thus, the prosecutor's comments were not contrary to the evidence produced at either the first or the second trial.
LSA-C.Cr.P. art. 774 provides:
The argument shall be confined to evidence admitted, to the lack of evidence, to conclusions of fact that the state or defendant may draw therefrom, and to the law applicable to the case.
The argument shall not appeal to prejudice.
The state's rebuttal shall be confined to answering the argument of the defendant.
Under Article 774, the prosecutor was confined in her rebuttal argument to responding to defense counsel's argument. In the portion of her argument at issue, the prosecutor was properly responding to defense counsel's arguments as to the State's lack of evidence at trial. In his closing argument, defense counsel addressed, among other things, the failure of police to find any blood or other evidence when they searched defendant's car. At one point defense counsel stated, "[t]here has been, as I said, no physical evidence whatsoever to link Mr. Schexnayder to this crime, none, whatsoever."
Defendant does not state how he was prejudiced by the State's rebuttal argument; nor is there any evidence in the record to show that he was so prejudiced. Accordingly, we find no merit in this assignment of error.
The final two assignments require a review of the record for errors patent. We have conducted such a review and find that the record in this case contains one such error. LSA-C.Cr.P. art. 930.8 dictates that, except under certain limited circumstances, a defendant must file his application for post conviction relief within three years after his judgment of conviction. Section (C) of that article provides: "At the time of sentencing, the trial court shall inform the defendant of the prescriptive period for post conviction relief." Defendant's sentencing transcript does not show that he was so informed. The trial court is directed to inform defendant of the provisions of LSA-C.Cr.P. art. 930.8 by sending appropriate written notice within ten *371 days of the rendition of this opinion and to file written proof that defendant received the notice in the record of the proceedings. See State v. Kershaw, 94-141 (La.App. 5 Cir. 9/14/94), 643 So.2d 1289; State v. Procell, 626 So.2d 954 (La.App. 3 Cir.1993); State v. Sumlin, 605 So.2d 608 (La.App. 2 Cir.1992).
Defendant filed a pro se brief in this matter. In accordance with the directive in State v. Melon, 95-2209 (La.9/22/95), 660 So.2d 466, we now consider the error assigned in that brief. Defendant maintains that the trial court erred in refusing to appoint counsel for defendant's motion for new trial based on ineffective assistance of counsel.
As previously stated there were two motions for new trial filed in this matter. The first was a pro se motion filed by defendant on August 14, 1995. In that motion, defendant alleged the discovery of new evidence based on his claim that Arthur Williams had been unduly influenced by the police to testify. Defendant also made a claim that his trial counsel was ineffective.
Another motion for new trial was filed by defendant's trial counsel on September 6.1995 in which three claims were made including a claim that the "State's principal witness, Arthur Williams, made statements to some inmates in the Jefferson Parish Correctional Center which suggest that his testimony might have been influenced by pressure applied on him by the prosecution". That motion was heard and denied on September 27, 1995. On October 5, 1995, the trial court denied defendant's pro se motion, and refused defendant's request for new counsel.
We find no error in the trial court's denial of defendant's pro se motion for new trial. This court has held that an ineffective assistance of counsel claim may be raised in a motion for new trial. State v. Serio, 94-131 (La.App. 5 Cir. 6/30/94), 641 So.2d 604, writ denied, 94-2025 (La.12/16/94), 648 So.2d 388. However, in denying counsel's motion, the trial court ruled on the substantive issue in defendant's pro se motion. Defendant was not entitled to a second hearing on motion for new trial which was based on the same substantive issue, and it follows that defendant was not entitled to appointment of new counsel.
By his assignment, defendant also appears to make a substantive claim of ineffective assistance of counsel. A defendant is entitled to effective assistance of counsel under the Sixth Amendment of the United States Constitution and Article I, Section 13 of the Louisiana Constitution. The Louisiana Supreme Court has held that a claim of ineffective assistance of counsel is most appropriately addressed through post conviction relief rather than direct appeal, so as to afford the parties an evidentiary hearing before the trial court and to create an adequate record for review. State v. Truitt, 500 So.2d 355 (La.1987); State v. Brown, 384 So.2d 983 (La.1980).
The record is insufficient in this case for this Court to make a substantive ruling on the issue of ineffective assistance. The issue is more appropriately raised by defendant on application for post conviction relief. The trial court's ruling does not bar defendant from so doing.
We hereby affirm the conviction and sentence. We remand the matter for further action in accordance with the above opinion.
AFFIRMED AND REMANDED.
NOTES
[1] Tobor testified that he does not wear a watch, and is therefore not certain of the time.
[2] See State v. O'Banion, 570 So.2d 556 (La.App. 4 Cir.1990), in which the defendant argued that the trial court had erred in admitting evidence of his co-perpetrator's separate actions following an armed robbery the two men had committed together. The court ruled that evidence regarding the actions of the defendant's co-perpetrator was relevant, and did not confuse or prejudice the jury. The reviewing court reasoned that the evidence at issue simply corroborated evidence presented through the victims' direct testimony.