841 So.2d 965 (2003)
STATE of Louisiana
v.
Terrence J. JONES.
No. 02-KA-908.
Court of Appeal of Louisiana, Fifth Circuit.
February 25, 2003.
*968 Paul D. Connick, Jr., District Attorney, Alan D. Alario, II, Terry M. Boudreaux, Assistant District Attorneys, Gretna, LA, for Plaintiff/Appellee.
Bruce G. Whittaker, Louisiana Appellate Project, New Orleans, LA, for Defendant/Appellant.
Panel composed of Judges SOL GOTHARD, THOMAS F. DALEY, and WALTER J. ROTHSCHILD.
THOMAS F. DALEY, Judge.
Defendant, Terrence J. Jones, appeals his conviction by a jury of second degree murder in violation of LSA-R.S. 14:30.1. On appeal, he makes the following Assignments of Error:
1. It was reversible error to permit the State to introduce to the jury the multiple out-of-court statements by James Artberry, the sole eye-witness to the shooting.
2. The trial court improperly restricted appellant's cross-examination of a key State witness.
Following review of the law and evidence, we affirm the defendant's conviction and sentence. Among defendant's numerous pre-trial motions was a Motion in Limine, in which he moved the court to disallow the admission, at trial, of the motion hearing testimony of a deceased witness, James Artberry. The court heard and denied the motion on June 29, 2000, ruling that the testimony was admissible under the hearsay exception for unavailable witnesses. Defendant applied for writs to this Court from the trial court's ruling. On July 14, 2000, this Court denied writs. State v. Jones, Writ No. 00-K-1286. Defendant subsequently applied for writs to the Louisiana Supreme Court. The Supreme Court denied writs. State v. Jones, 00-2155 (La.7/18/00), 766 So.2d 1261.
The State amended the Bill of Indictment on July 17, 2000, reducing the charge to second-degree murder, LSA-R.S. 14:30.1. On that day, defendant was arraigned as to the amended charge, and pled not guilty.[1] Trial began before a twelve-member jury. On July 19, 2000, the second day of trial, defendant moved for a mistrial, arguing the State prejudiced his case by withholding transcriptions of statements made to the police by James Artberry. Defendant complained that this failure to comply with discovery interfered with his ability to fully crossexamine James Artberry at the hearing on the Motion to Suppress Identification, and with the trial court's ability to make a determination regarding the reliability of the witness's identification. After hearing arguments on the matter, the trial court granted a mistrial, and reversed its prior ruling allowing the admission of James Artberry's motion hearing testimony finding that the recorded statements made to the police contained Brady material and since the defendant did not have the benefit of the recorded statements during the testimony of Artberry at the suppression hearing the defendant was denied the ability to effectively cross examine Mr. Artberry.
The State applied for writs to this Court from the trial court's ruling. State v. Jones, Writ No. 00-K-1432. This Court denied writs on September 13, 2000. The State then applied for writs to the Supreme Court. State v. Jones, Writ No. 00-KK-2837. The Supreme Court granted *969 writs on February 9, 2001. It issued a per curiam on June 29, 2000, reversing this Court's ruling, and holding that the State's failure to provide the statements prior to the motion hearing did not deprive defendant of his ability to fully cross-examine Mr. Artberry. The Supreme Court further found that Artberry's motion hearing testimony was admissible at trial. State v. Jones, 00-2837 (La.6/29/01), 791 So.2d 622.
On August 1, 2001, defendant filed a Motion to Quash Indictment. The motion was heard and denied on August 30, 2001. Although defendant orally noticed his intent to apply for writs from the trial court's ruling, the record does not show that he actually made a Writ Application. A second trial was held on November 13 and 14, 2001. At the conclusion of trial, the jury returned a unanimous verdict of guilty as charged.
On November 29, 2001, the court sentenced defendant to a mandatory term of life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. Defendant made a timely oral Motion for Appeal. The trial court granted the motion.
FACTS
Deputy Rene Pinac of the Jefferson Parish Sheriff's Office testified that he was on patrol at about 1:00 a.m. on July 28, 1997, when he received a call regarding a shooting at 7423 Fourth Street in Marrero. The victim was reported to be lying inside of a car. When he arrived at the scene, Deputy Pinac saw a blue Oldsmobile automobile in the parking lot of the Westbank Boat Supply Company, a business adjacent to the residence. The victim, Marty Martin (Martin), was lying motionless inside the car, his left leg hanging out of the open driver's side door. Deputy Pinac testified the victim appeared lifeless. Deputy Pinac called EMS. When EMS technicians arrived, they examined the victim, and found he had no vital signs.
Dr. Fraser Mackenzie was the forensic pathologist who performed the autopsy on the victim's body. He determined the cause of death was a gunshot wound that perforated the heart, lungs, and aorta. In his opinion, the victim would have bled to death within three to five minutes. The doctor testified that toxicology screenings revealed the victim had cocaine, amphetamines, and alcohol in his system. Sandra Barrette, Martin's mother, testified that her son had struggled with a cocaine addiction for several years.
James Artberry (Artberry), who lived at 7423 Fourth Street, approached Deputy Pinac and said he had witnessed the shooting. He gave the deputy a description of the perpetrator and his car. Deputy Pinac broadcast the information over the police radio. He then placed Artberry in the back of his police vehicle. Artberry was transported to the criminal investigations bureau of the sheriff's office, where homicide Detective Mike Tucker and Lieutenant Ralph Sacks questioned him.
Detective Tucker testified that he obtained a total of four statements from Artberry. Three of them were tape-recorded, and were admitted at trial. Those recordings were transcribed. The tapes were played for the jury at trial. The first interview was conducted at 3:18 a.m. on July 28, 1997. Artberry stated he had witnessed a shooting that night. He said he knew the victim casually for more than two years, and that he knew the man was a crack cocaine user.
Artberry in his statement said he encountered Martin on the night of July 27, 1997 at The Happy Hour Lounge, located at Fourth and Jung Streets. Artberry entered the bar at about 10:15 p.m. Martin arrived at about 10:35 p.m., and shortly *970 thereafter, he asked Artberry to help him find a prostitute. Artberry agreed, and went to Martin's car with him. The car was a light blue Oldsmobile or Buick. They were unsuccessful in locating a prostitute, and Martin drove Artberry back to the Happy Hour. Artberry walked home from there.
Artberry in his statement said he saw two unknown African-American men in a blue Pontiac Grand Prix park in front of his house. The car had tinted windows, and a yellow sticker on the back window, indicating a lack of insurance coverage. Artberry went inside his house, and watched the men through a window. The victim drove up the street at a high rate of speed, and parked in front of the house. Artberry opened his door, and saw that the victim was standing next to the Grand Prix, talking to its occupants through the open passenger side window. The driver of the Grand Prix exited the vehicle. Martin walked back to his own car, opened the door and reached inside. He then stood up and put his hand into his pocket as if he were searching for something. Artberry believed the men were engaging in a drug deal.
The driver of the Grand Prix fired two shots, striking Martin. The shooter was two to three feet away from the victim. The victim got into his car and lay down. The shooter fled the scene in his own car. Artberry said his brother came outside after the shots were fired, and Artberry instructed him to call police. Artberry told Tucker he did not get a good look at the shooter's face due to poor lighting in the area, and that he did not recognize the passenger in the shooter's car.
Artberry gave a second recorded statement at the Criminal Investigations Bureau at 4:08 a.m. on July 28, 1997. Artberry confessed that he had failed to disclose some pertinent information during the first interview because he was frightened of recrimination by the perpetrator. He had actually been involved as an intermediary in a drug deal gone wrong. He told the officers that the victim stopped him and said he was looking for some dope. Artberry thought he knew where the victim could purchase drugs, and he took him to Jung Street, near Fourth Street. They met with a woman whose name Artberry did not know. Artberry told the woman what Martin wanted. She in turn flagged down the blue Grand Prix. She told the car's occupants that Martin wanted drugs, and Martin followed the men in his car. Martin and the two African-American men met outside of Artberry's house.
Artberry in his statement stated that he saw the victim approach the passenger window of the Grand Prix. The passenger gave Martin a rock of crack cocaine, and Martin gave him money. Artberry heard the passenger say that Martin had only given him one dollar, and that Martin owed him twenty dollars. Martin searched his pockets, then went to his car and rummaged inside. The passenger told the driver to take his f___ing head off. The driver approached Martin with a gun. The driver told Artberry he faulted him for the deal's unsatisfactory outcome, and then he shot Martin twice. Martin turned and sat in his car. Artberry, fearing he would also be shot, went into his house.
During the second interview, Artberry identified the shooter as an African-American male name Terrence. He told the officers that Terrence lived on Poe Street in Westwego. Artberry said he had known Terrence for a couple of years, and that he was certain he was the perpetrator.
Based on the information he gathered, Detective Tucker composed a photographic lineup. He presented the lineup to Artberry, who was unable to identify any of *971 the subjects. Detective Tucker then compiled a second photographic lineup. He presented the lineup to Artberry, and Artberry identified photograph number four, Terrence Jones, as the man who shot Marty Martin.
After Artberry's identification of defendant from the second lineup, Detectives Tucker and Sacks interviewed Artberry a third time. The interview took place at Artberry's home, 7409 Fourth Street, on July 29, 1997, at 9:03 p.m. Artberry again stated that he saw Terrence fire shots at Martin. He said he witnessed the incident from a distance of 20 to 25 feet. He said he knew Terrence as a drug dealer. He again stated that Terrence fired two shots at the victim. Terrence then ran to his car, turned to point at Artberry in a threatening manner, and fled the scene.
James Artberry was deceased at the time of trial. The trial judge admitted the sworn testimony Artberry gave at an April 9, 1998 motion hearing under the "unavailable witness" exception to the hearsay rule. Artberry's prior testimony revealed that he witnessed a homicide next to his home at 1:17 a.m. on July 28, 1997. He further testified that he was able to identify the perpetrator in a photographic lineup, and that the perpetrator's name was Terrence. Artberry identified defendant in court as the same person he identified in the photographic lineup. He said he knew defendant for four or five years prior to the murder.
Gelandra Brue testified at trial that, during 1997, she lived on Jung Street in Marrero, about two blocks from Fourth Street. At one time, she worked as a prostitute. She also testified that she sometimes gives away drugs, but does not sell them. She sometimes gave drugs to James Artberry.
During the night and early morning of July 27-28, 1997, Brue was at her home. A white man came to her house and said he wanted to buy a "twenty," a twentydollar piece of crack cocaine. Brue did not know the man, although she had seen him earlier that evening. She told him she was not selling drugs, and he left. Ms. Brue surmised that someone had told the man she knew where to get crack. She did not want to deal with the man, however, as she suspected he was an undercover police officer. Some time between 1:00 and 2:00 a.m., a man whom she knew as James arrived at her house accompanied by the white man. James asked whether she knew where to get a "twenty." She told him, "around the corner." Ms. Brue walked around the corner, and James and his companion followed in a car driven by the white man. She went to a house a block away to find an individual whom she knew would have narcotics. This person was not at home, so she returned to her house. Defendant, whom Ms. Brue had known for a year, arrived in a blue Grand Prix. Another man was in the car with defendant.
Ms. Brue stood in her doorway, and defendant and James talked for 10 minutes. The men then left her house. The white man drove away in his car, followed by defendant and his companion. They headed toward Fourth Street, in the direction of James' house.
On the night of July 29, 1997, Detective Tucker showed Ms. Brue the two photographic lineups. She was unable to identify anyone from the first lineup, but identified defendant from the second lineup as one of the men she had seen that night. Upon completing the identification procedure, Detective Tucker interviewed Ms. Brue. The interview was tape-recorded and played at trial. She told Detective Tucker she knew the man in the photograph as Terrence, a drug dealer who lived in her neighborhood. Terrence sold drugs *972 in her driveway on a daily basis. She told the detective that Terrence had been at her house the night before, in his blue Grand Prix. Ms. Brue described how James and his white companion had come to her house in search of crack cocaine. She told the detective that when Terrence arrived at her house, James and his companion left with him. She had not seen Terrence since then.
Mary Gums testified that, at the time of the murder, defendant was living with her on Poe Street. She heard that a man was killed on Fourth Street, just two or three blocks away from her home. She later learned that defendant was wanted for the murder. Police searched her house pursuant to a warrant. Defendant telephoned her and asked her to give his lawyer's telephone number to a "witness" who lived next door to the murder scene. Defendant wanted this witness to call the lawyer. Ms. Gums complied with defendant's request. Ms. Gums pled guilty to accessory after the fact to second-degree murder.
Defendant gave a recorded statement to police at the time of his arrest on October 26, 1997. The tape recording was played for the jury. Defendant told Detective Tucker that, on July 28, 1997, he was in Amite, Louisiana, visiting relatives. He returned home between 5:00 and 6:00 p.m. on July 28, 1997. He left his car, a Pontiac Grand Prix, at home, because it was not running well. He told the detective that the car had tinted windows and a yellow insurance citation sticker. When asked where he had been living until the time of his arrest, he responded, "No permanent place."
ASSIGNMENT OF ERROR NUMBER ONE
Appellant alleges that it was reversible error to permit the State to introduce to the jury the multiple out-of-court statements by James Artberry, the sole eyewitness to the shooting, made during police interrogation, as they constituted inadmissible hearsay.
James Artberry, the only eyewitness to Marty Martin's murder, died prior to defendant's first trial. In response to a Motion in Limine filed by defendant's counsel, the trial court ruled that Artberry's testimony at a pre-trial suppression hearing would be admissible at trial under the hearsay exception for prior recorded testimony of an unavailable declarant. LSA-C.E. art. 804 B(1). Defendant unsuccessfully sought review of the trial court's ruling on the Motion in Limine in this Court, and in the Louisiana Supreme Court.
At the first trial, during redirect examination of Deputy Michael Tucker, the State showed defense counsel two statements Artberry made to police on the morning of the victim's death. Defense counsel moved for a mistrial, on grounds that the State had not disclosed either statement before the hearing on defendant's Motion to Suppress Artberry's identification. The trial court conducted a hearing out of the jury's presence, and determined that the State had not, in fact, disclosed the statements before the suppression hearing, despite defendant's discovery request. The court reversed its earlier ruling on the admissibility of Artberry's prior sworn testimony on grounds that the State's withholding of the statements had deprived the court, and would deprive the jury, of the opportunity to determine the reliability of Artberry's identification in light of his prior conflicting police statements. In his reasons for granting the mistrial, the court further noted that the jurors had learned of Artberry's identification in the State's opening remarks.
The State sought review of the trial court's ruling. This Court upheld the ruling *973 on grounds that "the defense did not have an opportunity to fully and effectively cross-examine the now unavailable witness, a necessary condition for admissibility of the former testimony." State v. Jones, Writ No. 00-1432. The Louisiana Supreme Court reversed this Court's ruling, and remanded the case to the trial court. State v. Jones, 00-2837 (La.6/29/01), 791 So.2d 622. The Supreme Court reasoned that the State did not necessarily breach any statutory or constitutional duty owed to the defense to disclose the witness's statements well in advance of trial.[2] The Supreme Court also found that, notwithstanding the missed opportunity to confront Artberry directly in court regarding the police statements, pursuant to LSA-C.E. art. 806, the defense would have the opportunity to place the prior statements before the jury to challenge Artberry's credibility and to argue what those statements might reveal about the accuracy of Artberry's identification. State v. Jones, 00-2837 at p. 12, 791 So.2d at 628.
At defendant's second trial, Artberry's motion hearing testimony taken in court under oath was admitted without objection. However, when the State attempted to question Detective Tucker regarding Artberry's recorded police statements, defendant objected on grounds that the statements constituted inadmissible hearsay. The State responded that the statements were not hearsay, as they were not being introduced for the truth of the matter asserted, but only to present a complete picture of how the officers conducted their investigation. The trial court ruled that it would "allow it for purposes of him relating as to how he conducted his investigation." Defense counsel moved for a mistrial, and the court denied the motion.
The State introduced the recordings and corresponding transcripts of Artberry's statements during Detective Tucker's testimony. Defense counsel again objected on grounds of hearsay, arguing that the admission of the tapes would violate defendant's Sixth Amendment right of confrontation. The prosecutor argued that the Louisiana Supreme Court, in its per curiam, had ruled that the tapes were admissible. He also pointed out that defense counsel had raised the issue of Artberry's truthfulness in his opening statement, thereby opening the door to admission of the tapes. Last, the prosecutor argued that the tapes were admissible under LSA-C.E. art. 801 D(1)(b), which provides:
D. Statements which are not hearsay. A statement is not hearsay if:
(1) Prior statement by a witness. The declarant testifies at the trial or hearing and is subject to crossexamination concerning the statement, and the statement is:
(b) Consistent with his testimony and is offered to rebut an express or implied charge against him of recent fabrication or improper influence or motive.
Defense counsel argued that LSA-C.E. art. 801 D(1)(b) did not apply under these circumstances, although he admitted to having called Artberry's credibility into question in his opening statement. The trial court overruled defense counsel's objections, without giving reasons. The tapes and transcripts of Artberry's statements *974 were subsequently admitted into evidence in the State's case.
Defendant argues that the State did not offer any valid basis for the admission of Artberry's statements, and that they should have been excluded under the hearsay rule. Hearsay is defined as "a statement, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted." LSA-C.E. art. 801 C. Hearsay evidence is not admissible except as otherwise provided by the Code of Evidence or other legislation. LSA-C.E. art. 802; State v. Cowart, 01-1178, p. 19 (La.App. 5 Cir. 3/26/02), 815 So.2d 275, 288.
The State's argument below, that Artberry's statements were admissible to explain Detective Tucker's actions, lacks merit. In State v. Dyer, 00-1866, p. 14 (La.App. 5 Cir. 4/25/01), 794 So.2d 1, 12, this Court stated, "A police officer, in explaining his own actions, may refer to statements made to him by other persons involved in the case." Although the investigative officer was permitted to refer to a statement made by a co-defendant in Dyer the statement in its entirety was not admissible.
In State v. Broadway, 96-2659, pp. 8-9 (La.10/19/99), 753 So.2d 801, 809, cert. denied, 529 U.S. 1056, 120 S.Ct. 1562, 146 L.Ed.2d 466 (2000), the Louisiana Supreme Court discussed the limitations on the admission of such testimony:
Information about the course of a police investigation is not relevant to any essential elements of the charged crime, but such information may be useful to the prosecutor in "drawing the full picture" for the jury. However, the fact that an officer acted on information obtained during the investigation may not be used as an indirect method of bringing before the jury the substance of the out-of-court assertions of the defendant's guilt that would otherwise be barred by the hearsay rule. State v. Wille, 559 So.2d 1321, 1331 (La.1990); State v. Hearold, 603 So.2d 731, 737 (La.1992). As this Court emphasized in Hearold, 603 So.2d at 737.
Absent some unique circumstances in which the explanation of purpose is probative evidence of a contested fact, such hearsay evidence should not be admitted under an "explanation" exception. The probative value of the mere fact that an out-of-court declaration was made is generally outweighed greatly by the likelihood that the jury will consider the statement for the truth of the matter asserted.
See also, State v. Wille, 559 So.2d 1321, 1331 (La.1990), in which the Supreme Court commented:
Admission of information received by a police officer in the investigation of a crime, on the basis that such information explains the officer's presence and conduct and therefore does not constitute hearsay evidence, is an area of widespread abuse. McCormick on Evidence § 249 (E. Cleary 3d ed.1984). Such information frequently has an impermissible hearsay aspect as well as a permissible nonhearsay aspect, and the court in determining admissibility should balance the need of the evidence for the proper purpose against the danger of improper use of the evidence by the jury. Id. The fact that an officer acted on information received in an out-of-court assertion may be relevant to explain his conduct, but this fact should not become a passkey to bring before the jury the substance of the out-of-court information that would otherwise be barred by the hearsay rule. G. Pugh, Louisiana Evidence Law 429-431 (1974).
*975 It appears the State primarily used the recorded statements to bolster its case against defendant. Artberry's motion hearing testimony primarily concerned identification procedures, and did not contain a great many details regarding the events leading up to the murder. Artberry's second statement gave a more detailed description of the murder, and specifically named defendant as the perpetrator.
The prosecutor argued below that the Supreme Court, in its per curiam, held that the State might use Artberry's statements as evidence at trial. A reading of the Supreme Court's opinion shows that such is not the case. The Supreme Court addressed the admissibility of Artberry's motion hearing testimony, and whether defendant's confrontation rights were violated. The court did suggest that defendant might introduce the statements "to acquaint jurors with all of the circumstances surrounding the witness's identification of respondent and thereby allow them to reach a reliable determination as to the accuracy of the identification." See, State v. Jones, 00-2837 at p. 12, 791 So.2d at 628. However, there is nothing in the opinion that can be reasonably interpreted as sanctioning the use of the recorded statements by the State as direct evidence.
The admission of the recorded statements at trial is, however, supported by LSA-C.E. art. 801(D)(1)(b). The statements could be offered as consistent statements intended to "rebut an express or implied charge against [Artberry] of recent fabrication or improper influence or motive."
Pugh, Force, Rault & Triche, Handbook on Louisiana Evidence Law (2000) 485-486 interprets the LSA-C.E. art. 801(D)(1)(b) as follows:
For a statement to qualify as an exemption from the hearsay rule under Article 801(D)(1)(b), it is necessary for the witness's statement to have been attacked as a recent fabrication or claimed to have been prompted by an improper influence or motive. The Subparagraph speaks of response to an express or implied "charge" rather than to the introduction of "evidence." State v. Domino, 708 So.2d 1143 (La.App. 1 Cir. 1998) seems correct, therefore, in concluding that the required charge may come by way of opposing counsel's voir dire and opening statement suggestions that the witness-declarants may be biased or may have colluded against his client. The Article specifies that the testimony is admissible for purposes of rebuttal. The mere fact of a prior inconsistent statement is insufficient to ground the admissibility of the antecedent consistent statement under this provision; there must have been an express or implied suggestion that the witness changed his story because of some purported motive to falsify.
Defense counsel throughout the trial attacked Mr. Artberry's credibility, alleges that he made false statements to the police, and that Mr. Artberry was in fact the perpetrator of the murder. Beginning in opening arguments defense counsel makes reference to Mr. Artberry's first statement in which Mr. Artberry claims he didn't know who committed the murder. Defense counsel continues in his opening statement to say that sometimes later while Mr. Artberry is still in police custody and a possible suspect, Mr. Artberry's story got spun into identifying the defendant, Terrence Jones. Defense counsel continues to attack Mr. Artberry's identification of the defendant as the perpetrator throughout the trial by suggesting that the shot that killed the victim could have come from inside Mr. Artberry's fence. Defense counsel suggested that Ms. Brue was a principal to murder and that Mr. Artberry *976 was the killer. During the trial defense counsel repeatedly indicated he wished to impeach Mr. James Artberry's credibility. Defense counsel later argues that the testimony of the investigating officers corroborated his opening statement in which he indicated that Artberry lied to the police. The attack on Artberry's motive for identifying defendant allowed the State to use Artberry's prior recorded statements as a rehabilitative measure.
In State v. Easter, 32,940 (La.App. 2 Cir. 4/07/00), 756 So.2d 703, writs denied, 00-1321 (La.2/9/01), 785 So.2d 28, 00-2529 (La.6/29/01), 794 So.2d 823, the court found that, under LSA-C.E. art. 801 D(1)(b), a witness's prior police statement was not inadmissible hearsay. In that case, the defense counsel cross-examined the witness concerning a police statement, alleging that the witness's trial testimony differed from that statement. The State was later allowed to call the officer who took the witness's statement, and elicit testimony that showed the substance of the police statement was largely consistent with the witness's trial testimony.
See also, State v. Ball, 32,498 (La.App. 2 Cir. 12/15/99), 748 So.2d 1249. The court in that case found that, under LSA-C.E. art. 801 D(1)(b), police officers' testimony repeating witnesses' recorded statements was not hearsay. The defense, in crossexamining the witnesses, implied they had fabricated information, so the State was allowed to buttress their testimony.
Based on the foregoing, the trial court did not err in allowing the State to admit James Artberry's recorded statements made to the police.
ASSIGNMENT OF ERROR NUMBER TWO
Defendant complains that the trial court violated his Sixth Amendment right to confront and cross-examine witnesses by barring him from cross-examining State witness, Mary Gums, regarding any deal she might have struck with the State. A defendant's right to demonstrate facts and circumstance, which might influence a witness's perceptions or color his testimony (thereby lessening the weight the fact-finder might accord the testimony), is an important function of the right to confront and cross-examine embodied in the Sixth Amendment to the United States Constitution, and La. Const. Art. I, § 16. Davis v. Alaska, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974); State v. Bowie, 00-3344, p. 10 (La.4/30/02), 813 So.2d 377, 385, cert. denied, ___ U.S. ___, 123 S.Ct. 416, 154 L.Ed.2d 297 (2002). See also, LSA-C.E. art. 607 C, D. The right to cross-examine includes the right to question the witness concerning any bias or self-interest attached to the witness's testimony. However, the right to confrontation is not so unlimited as to require that a defendant be allowed, on cross-examination of a State witness, to make any and all inquiries of whatever character. The inquiry must be relevant. State v. Howard, 01-5, p. 9 (La.App. 5 Cir. 4/24/01), 786 So.2d 174, 180-181, writ denied, 01-1467 (La.4/26/02), 816 So.2d 846.
The possibility that the State may have some "leverage over a witness due to that witness's pending criminal charges is recognized as a valid area of cross-examination." State v. Rankin, 465 So.2d 679, 681 (La.1985). A witness's hope or knowledge that he will receive leniency from the State in exchange for his testimony is highly relevant to establish bias or interest. State v. Bowie, supra. A witness's bias or interest may arise from arrests, pending criminal charges, or the prospect of prosecution, even when he has made no agreements with the State regarding the conduct. State v. Vale, 95-1230 (La.1/26/96), 666 So.2d 1070, 1072; State v. Schexnayder, 96-98 (La.App. 5 *977 Cir. 11/26/96), 685 So.2d 357, writs denied, 97-0067 (La.5/16/97), 693 So.2d 796, cert. denied, 522 U.S. 839, 118 S.Ct. 115, 139 L.Ed.2d 67 (1997). If the State entered into a deal with a witness, and if the revelation would have lessened the witness's credibility, thereby influencing the jury's judgment, the defendant is entitled to reversal and a new trial. Giglio v. United States, 405 U.S. 150, 153, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972).
Ms. Gums, defendant's former girlfriend, testified that she acted as a go-between for defendant and a "witness" (presumably, James Artberry). On direct examination, she was questioned as follows regarding the consequences of her involvement with defendant:
Q. [prosecutor] Let me ask you this, Ms. Gums. Have you ever been convicted of any crimes?
A. Yes, sir.
Q. What have you been convicted of?
A. Accessory After the Fact.
Q. To Second Degree Murder?
A. Yes, sir.
Q. That stems out of this case.
A. Out of this case.
Q. You pled guilty in Jefferson Parish?
A. Yes, sir.
Q. What were you sentenced to?
A. Two years probation.
Q. Okay. Why did you plead guilty?
A. Because of this crime.
Q. The question I have for you is that; you were able to work out a probation? Did you get a probation?
A. Yes, sir.
Q. Alright. You had to stay with your children at that point?
A. Yes, sir.
* * * *
Q. As a result of your getting a two-year probation, you have to testify the way you're testifying right now for the Jury, to work out that deal?
A. Yes, sir.
It does not appear that defendant was deprived of his right of confrontation. The judge did not bar counsel from questioning Ms. Gums about a deal she might have had with the State. The court simply instructed counsel to re-phrase his question. Counsel was, ultimately, able to draw from Ms. Gums an apparent admission that her two-year probation was based on a "deal." Counsel might have attempted to elicit further details regarding this "deal," but chose not to do so. The testimony adduced from Ms. Gums was sufficient to expose her bias or interest. Based on the foregoing, this Assignment of Error is without merit.
ERRORS PATENT DISCUSSION
The record was reviewed for errors patent, according to LSA-C.Cr.P. art. 920. State v. Oliveaux, 312 So.2d 337 (La.1975); State v. Weiland, 556 So.2d 175 (La.App. 5 Cir. 1990). No patent errors were found.
AFFIRMED.
NOTES
[1] The minute entry for July 18, 2000 provides that the bill was amended and defendant was arraigned on that day. However, based on the handwritten amendment on the bill itself, and the transcript of July 17, 2000, indicate that July 17 is the correct date.
[2] The Supreme Court stated that, "the state generally has no statutory discovery duty to disclose the pre-trial statements of its witness unless they are co-defendants in the case. La.C.Cr.P. art. 722. The state's duty under the Due Process Clause to disclose material exculpatory evidence protects the defendant's right to a fundamentally fair trial, United States v. Bagley, 473 U.S. 667, 678, 105 S.Ct. 3375, 3381, 87 L.Ed.2d 481 (1985)." State v. Jones, 00-2837 at pp. 7-8, 791 So.2d at 626.