MARC E. JOHNSON, Judge.
| iAppellant/Pefendant, Quoc-Khoi Pham, appeals his conviction of manslaughter and 35-year sentence from the 24th Judicial District Court, Division “E”. For the following reasons, we affirm Defendant’s conviction and sentence.

STATEMENT OF THE CASE

The Jefferson Parish Grand Jury returned an indictment charging Defendant with the second degree murder of Prentis Perry, a violation of La. R.S. 14:30.1. Defendant was arraigned on February 19, 2010 and pleaded not guilty. Defendant filed pre-trial motions to suppress statement and identification, which were denied by the trial court on July 7, 2010.
The case was tried before a 12-person jury on December 5 and 7, 2011, after which the jury found Defendant guilty of the lesser included offense of manslaughter. On December 13, 2011, the trial judge sentenced Defendant to 35 years imprisonment at hard labor. After imposing his sentence, the trial judge denied Defendant’s oral motion to reconsider sentence. On December 19, 2011, ^Defendant filed a written motion to reconsider sentence, which was also denied. On that same date, Defendant filed a motion for appeal, which was signed by the trial judge on January 3, 2012. Defendant now appeals his conviction and sentence for manslaughter.

FACTS

On October 22, 2009, Prentis Perry, the victim, was shot and killed on Diplomat Street in Terrytown[1] by Defendant. Defendant admitted that he shot the victim, but he asserts that the killing was done in self-defense.
Annette Larre testified that she resided at 513 Diplomat Street at the time of the shooting. She was at home on her couch when she heard two gunshots. Larre testified that upon hearing the gunshots, she looked out of her sliding glass door, which faces “up Diplomat,” and observed two males standing in the street about. two houses down from her location. Larre *206 testified that one of the men “had his arm out, and the, other one was just standing there.” She then observed the man with the outstretched arm fire approximately five more shots in the direction of a nearby driveway, but she could not see at whom the shots were being fired. When the shooting ceased, Larre testified that the two men ran, and she was unable to get a look at their faces.
Dr. Susan Garcia, a forensic pathologist, testified that she performed the autopsy on the victim. Dr. Garcia testified the victim sustained seven gunshot wounds. Specifically, Dr. Garcia testified that the victim sustained three gunshot wounds to the back of his body and four to the front of his body. Among the wounds, the victim sustained a lethal gunshot wound, which entered through the back of the victim’s head and exited between his eyes. Dr. Garcia also recovered two projectiles from the victim’s body and one projectile from inside the body bag. |4Pr. Garcia opined that the victim was shot at a distant range, i.e. greater than three feet, depending on the weapon used. Dr. Garcia further testified that a toxicology report revealed that the victim had marijuana and trace amounts of benzodiazepine in his system at the time of his death. Dr. Garcia concluded that the cause of death was multiple gunshot wounds, and the manner of death was homicide.
Darius Edmonson testified that he has known Defendant for his entire life. Ed-monson testified that, on the day of the shooting, he was with Defendant when the victim asked them for a ride to Devin Leige’s house. Edmonson believed the victim was armed with a firearm. After dropping off the victim, Defendant noticed that his gun magazine had gone missing from the backseat.[2] Believing the victim had taken it, Defendant threatened the victim stating, “[y]ou coming down my neck like that, Dog, I’ll f* * * you over you, Dog. Don’t come near me like that.”[3]
Edmonson further testified that later that same day, they arranged to meet the victim on Diplomat Street to buy drugs. According to Edmonson, during the drug exchange, the victim started “mouthing off’ to Defendant about the gun clip, and then the victim acted like he was “grabbing on something” or “clutching” what Edmonson believed to be a gun. Edmon-son testified that he frequently saw the victim in the neighborhood with his .40 caliber handgun “hanging out his pocket.” Edmonson admitted that he never mentioned anything about the victim “clutching” what he believed to be a gun until trial because his memory had improved since his interview with the police. Ed-monson testified that the victim did not shoot at him and Defendant that night because the victim did not believe he had a chance. [fiEdmonson explained that during the drug transaction, he and Defendant attempted to- gather their money together when Defendant pushed Edmonson out of *207 the way and started shooting at the victim when the victim began to reach into his pants to grab, what he believed to be, his handgun.[4] However, Edmonson testified that he did not actually see a weapon. After the shooting ceased, Edmonson testified that he and Defendant ran to his (Edmonson’s) brother’s house, and that he did not know what Defendant did with the gun he used to shoot the victim.
Edmonson testified that “the whole neighborhood” was after Defendant and was trying “to harm him ... even saying that: We going to go get the Chinese Boy. And if Darius with him, we go get him, too.” Edmonson testified that Defendant was in fear for his life because of these threats.[5]
On cross-examination, Edmonson testified that because of the neighborhood threats to himself and Defendant, he had heard that Defendant was going to obtain a gun for protection. Edmonson also testified that the victim had a tattoo on his head which signified the number of bodies he had on his “belt.” Edmonson further testified that on the night of the shooting he “assumed” the victim had a gun on him because he “always” carried one with him.
Devin Leige testified that at the time of the murder, he was living in Terrytown and was a friend of the victim. Leige also testified that he was acquainted with Defendant and Edmonson. On the day of the shooting, Leige testified that Edmonson and Defendant gave him a ride to his house. Later that 1 (¡day, Leige saw Defendant again. According to Leige, Defendant was inquiring about a gun clip that had gone missing and believed the victim had stolen it. On cross-examination, Leige was asked about a prior shooting incident that occurred when he was stopped and questioned by Defendant about the gun clip. Leige denied knowledge of the shooting incident from which three casings from the pistol used in the murder were recovered. Leige further denied knowing whether the victim ever sold or used drugs and stated that he had never seen the victim in possession of a firearm.
Detective Roger Gorumba testified that he took two statements from Defendant, which were played for the jury. In his first statement, Defendant told Detective Gorumba that he knew the victim as a drug dealer from the neighborhood. Defendant stated that he had the victim’s phone number in his cellular phone because he had previously purchased drugs from him. Defendant explained the events leading up to the shooting, indicating that he had driven over to Edmonson’s house in the afternoon. Later that day, he and Edmonson were driving around in his car when they encountered Devin Leige. Defendant told Detective Gorumba that they stopped briefly to talk to Leige because Leige and Edmonson were friends. They then returned to Edmonson’s house later that evening where they spent the night playing video games, watching movies, and listening to music. Defendant stated that *208 while listening to music they heard multiple gunshots. Defendant told Detective Gorumba that, after waking up the next morning, he and Edmonson were walking around the neighborhood to find out what happened when they were picked up by the police. Defendant further stated that the only contact he had with the victim before the shooting was when he observed the victim drive by Edmonson’s house. He also stated that, whenever he would see the victim around the neighborhood, the victim would not look at him or 17associate with him. Defendant stated that neither he nor Edmonson had any “problem” with the victim, and that the victim had no issues with him. Lastly, Defendant stated that the only firearm he owns is a Mossberg shotgun, which he has for “house protection.”
In his second statement, Defendant was informed that he was under arrest for second degree murder. He told Detective Gorumba that on the night of the shooting, he was walking down Diplomat Street to meet up with the victim to purchase marijuana. Defendant stated that when he was pulling out his money to pay for the drugs, the victim tried to take his money and gun from him; and, that is when he “backed up” and shot him. Defendant explained that, prior to the drug transaction, his handgun remained concealed in his pocket. Defendant further stated that he and the victim were alone when this incident occurred. Defendant explained that “everything happened so fast,” and that after the shooting, he “ran for his life,” disposing of the gun by giving it away to an unknown drug addict he encountered on the street. When asked by Detective Gorumba if Defendant felt he was justified in his actions, Defendant stated, “I felt like if I wasn’t gonna do it, I was gonna be shot.” Defendant also stated that, although he did not see the victim with a gun at the time of the shooting, he had seen the victim with guns before and explained that he could not see where the victim’s left hand was at the time of the drug transaction. Defendant told Detective Gorumba that the night of the shooting was only the second time he engaged in a hand-to-hand drug transaction with the victim, and that he did not think the victim “was gonna do anything like that.” He also stated that he obtained the marijuana from the victim that night but did not recall what happened to the drugs after he fled the scene. Defendant further explained that he had been carrying his gun with him for about six or seven months [8for protection. Defendant also explained that earlier in the day, the victim had stolen the magazine for his gun.
William Walker testified that, in October of 2009, he was incarcerated in Jefferson Parish jail for possession of cocaine. While in jail, Walker testified that he overheard Defendant bragging that he had “killed somebody because they stole something from him, and he’d kill again if somebody else steals something from him.” After providing the police with this information, the police presented Walker with a photographic lineup from which he identified Defendant as the individual who had made that comment. On cross-examination, Walker testified that Defendant also stated that he confessed to the crime. Walker was then confronted with the statement he previously provided to the police in which he told them that Defendant had stated that he stabbed the victim; however, at trial, Walker denied hearing Defendant “say how he killed” the victim.
A stipulation was entered into between the parties regarding the 911 tape recordings and was published to the jury.[6]
*209 Captain Don English of the Jefferson Parish Sheriffs Office testified that he was the lead detective in charge of the scene investigation in the instant case. Captain English testified that he sketched a diagram of the crime scene, which depicted the location of the victim’s body and the locations of the physical evidence collected by the Crime Scene Division. According to Captain English, nine spent casings were collected. Captain English testified that there were two groupings of casings, one near the body of the victim and the other “a little bit father [sic] away.”[7] The victim was found lying in a grassy area in front of a home |9located at 518 Diplomat Street. On cross-examination, Captain English testified that the victim’s hands were tested for gunshot residue, and that the results came back a “presumptive positive.” No firearms were found at the scene.
A second stipulation was offered regarding Meredith Acosta, an expert in firearms examination. It was stipulated that all of the casings recovered from the crime scene were fired from the same 9mm firearm. It was also stipulated that all of the projectiles recovered were fired from the same weapon and of the same class of ammunition.
Colonel Timothy Scanlan of the Jefferson Parish Sheriffs Office Crime Laboratory division was qualified as an expert in the field of firearms examination. Colonel Scanlan discussed gunshot residue testing, noting that gunshot residue can be found on a victim who is as far as 20 feet away from his shooter, and that a victim who has suffered multiple gunshot wounds has an increased probability of having gunshot residue on their person. Colonel Scanlan further testified about gunshot residue studies compiled by experts in the field. According to Colonel Scanlan, the studies have concluded that it is expected for a victim of a shooting to have gunshot residue on their hands or person.[8] Colonel Scanlan testified that in the instant case, the “Instant Shooter Test” was performed on the victim to determine whether there was a presence of gunshot residue. However, such test is no longer utilized by crime laboratories because it does not help to determine if someone was the shooter or a victim of a shooting; it only shows that the person was in close proximity to a weapon when it was discharged.[9]
| ^Detective Gary Barteet of the Jefferson Parish Sheriffs Office was the case officer assigned to investigate the killing of Prentis Perry. Detective Barteet testified that he arrived on the scene of the shooting shortly after the incident occurred on October 22, 2009, at approximately 12:35 a.m. Once on scene, Detective Barteet took possession of a cellular phone that had been retrieved near the victim’s body.[10] Detective Barteet testified that no *210 weapons or drugs were recovered from the body of the victim. Later, Defendant’s cellular phone was also seized and, with Defendant’s permission, his text messages were obtained. Detective Barteet testified that the content of the text messages outlined what he had learned during his investigation, specifically, that the victim had taken a piece of property from Defendant which he was “complaining” about.
Jeff Strohm, records custodian for Sprint Telecommunications, testified that pursuant to a court order, he provided subscriber information for telephone number (504) 782-7488. The subscriber’s name was listed as Tony Pham. Text messages associated with that particular account were obtained. From this information, it was revealed that several text messages were sent on the evening of October 21, 2009, continuing into the early morning hours of October 22, 2009 to a telephone number identified as (504) 982-7880.[11] The text messages and call detail records[12] for the telephone number ending in 7488 were introduced into evidence without objection.[13]
After notifying the victim’s family of the incident, Detective Barteet spoke with Devin Leige, per their suggestion. It was from Leige that Detective Barteet 11, developed a lead on two possible suspects — Defendant and Edmonson. Defendant and Edmonson were located and brought to the police station. Detective Barteet testified that he took Edmonson’s statement while another detective took Defendant’s statement. Detective Barteet noted that both of their statements were inconsistent with one another.[14] In his statement, Edmonson did not tell Detective Barteet that the victim had a gun on the night of the murder, or that the victim was reaching for a gun in a threatening manner. Edmonson told Detective Bar-teet that Defendant had “tripped out.” Based on subsequent questioning, both Defendant and Edmonson were placed under arrest. Detective Barteet testified that search warrants were obtained for Defendant’s vehicle, Defendant’s residence, and Edmonson’s residence but they were unable to locate the murder weapon.
On cross-examination, Detective Barteet testified that he interviewed an inmate by the name of Walker who advised him that Defendant had stated that he confessed to the murder, and that he believed Defendant said the victim was stabbed but he was not sure. Detective Barteet also confirmed that there was a ballistics match to the murder weapon used and an incident that occurred earlier that day regarding an illegal discharge of a firearm.

ASSIGNMENTS OF ERROR

On appeal, Defendant raises the following assignments of error: 1) the verdict in this matter is contrary to the law and the evidence; 2) the trial court erred in the admission and use of the grand jury testimony of Darius Edmonson at trial; 3) the trial court erred in the denial of the introduction of Darius Edmonson’s testimony after its release pursuant to the State’s *211 request; 4) the trial court improperly admitted the alleged statement of Darius Edmonson to the Jefferson Parish Sheriffs Office during trial; 5) the trial court erred in denying the | ^introduction of the complete police statement of Darius Ed-monson; 6) the trial court erred by imposing an excessively harsh sentence; and 7) the trial court erred in its denial of the Motion to Reconsider Sentence.

Assignment of Error Number One

Defendant does not contest that he fired his gun at the victim and caused his death. Rather, in his first assignment of error, Defendant argues that when viewing the evidence in the light most favorable to the prosecution, the evidence presented at trial fails to prove that Defendant’s actions were not justified. Defendant contends that the State did not prove the shooting was not done in self-defense because the evidence at trial established that the victim’s hands tested positive for gunshot residue. Additionally, Defendant avers the testimony of one witness stated that the victim always carried a gun and was “clutching” for a weapon at the time of the confrontation with Defendant. Thus, Defendant asserts that the evidence was insufficient to convict him of manslaughter.
Defendant’s theory of self-defense was presented to the jury throughout the trial and was also provided as an option to the jury in the form of a jury instruction prior to deliberation. The jury rejected Defendant’s theory that the homicide in this case was justified and returned a responsive guilty verdict of manslaughter.
In reviewing the sufficiency of evidence, an appellate court must determine that the evidence, whether direct or circumstantial, or a mixture of both, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime have been proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Neal, 00-0674 (La.6/29/01); 796 So.2d 649, 657, cert. denied, 535 U.S. 940, 122 S.Ct. 1323, 152 L.Ed.2d 231 (2002). In cases involving circumstantial evidence, the trial court must instruct the jury that “assuming every 11Rfact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence.” La. R.S. 15:438.
The reviewing court is not required to determine whether another possible hypothesis of innocence suggested by the defendant offers an exculpatory explanation of events. Rather, the reviewing court must determine whether the possible alternative hypothesis. is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt. State v. Mitchell, 99-3342 (La.10/17/00); 772 So.2d 78, 83; State v. Washington, 03-1135 (La.App. 5 Cir. 1/27/04); 866 So.2d 973, 977.
In this case, Defendant was charged with second degree murder but was convicted of the responsive verdict of manslaughter.[15] La. R.S. 14:31 delineates two theories of manslaughter: specific in *212 tent manslaughter and felony/misdemean- or manslaughter. Under La. R.S. 14:31A(1), manslaughter is a first or second degree murder that is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection.
Here, Defendant does not argue that the State failed to prove the elements of manslaughter. Rather, he contends that the State failed to prove that he did not act in self-defense. According to La. R.S. 14:20, a homicide is justifiable “[w]hen committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger.”
| i4The fact that an offender’s conduct is justifiable, although otherwise criminal, constitutes a defense to prosecution for any crime based on that conduct. La. R.S. 14:18. When a defendant claims self-defense in a homicide case, the State must prove beyond a reasonable doubt that the defendant did not act in self-defense. State v. Cassard, 01-931 (La.App. 5 Cir. 2/26/02); 811 So.2d 1071, 1076, writ denied, 02-0917 (La.12/19/02); 833 So.2d 327. The relevant inquiry on appeal is whether a rational fact-finder, after viewing the evidence in the light most favorable to the prosecution, could have found, beyond a reasonable doubt, that the homicide was not committed in self-defense. Id.
The determination of a defendant’s culpability focuses on a two-fold inquiry: (1) from the facts presented, could the defendant reasonably have believed his life to be in imminent danger; and (2) was deadly force necessary to prevent the danger. State v. T.N., 94-669 (La.App. 5 Cir. 1/18/95); 650 So.2d 288, 289. While there is no unqualified duty to retreat from an altercation, the possibility of escape is a recognized factor in determining whether or not a defendant had a reasonable belief that deadly force was necessary to avoid the danger. Id., 94-669; 650 So.2d at 290. Additionally, a person who is the aggressor or who brings on a difficulty cannot claim self-defense, unless he withdraws from the conflict in good faith. State v. Mills, 04-489 (La.App. 5 Cir. 3/29/05); 900 So.2d 953, 959, writ denied, 05-1470 (La.1/13/06); 920 So.2d 235. The jury is the ultimate fact-finder in determining whether a defendant proved his condition and whether the State negated the defense beyond a reasonable doubt. State v. Theriot, 07-71 (La.App. 5 Cir. 6/26/07); 963 So.2d 1012, 1020, writ denied, 07-1598 (La.2/1/08); 976 So.2d 715.
Based on the following, we find that the jury reasonably could have concluded that Defendant could not have believed that he was in imminent danger [ 15of losing his life or receiving great bodily harm, and that the State adequately negated the defense of justification beyond a reasonable doubt.
In the instant case, the testimony of disinterested eyewitness Annette Larre established that she was in her living room when she heard two gunshots. Upon looking out of her window, she clearly observed the shooter and a second male (Edmonson) standing in the street approximately two houses down from her house. She testified that, although she could not identify the shooter, she clearly observed him in a stationary position with his arm extended firing more than five gunshots in the victim’s direction. Her testimony established that Defendant was not running away while firing the gun to avoid an attack but rather stood in one place firing one shot after another.
*213 Larre’s testimony was corroborated by the physical evidence in this case. Captain English testified that there were two groups of casings found at the scene, one of which consisted of two casings found a few feet from the victim, while the other casings were discovered near the body of the victim. Moreover, Dr. Garcia testified that the victim sustained seven gunshot wounds, three to the back of his body and four to his front torso. Based on this evidence, the jury could have believed that the victim was attempting to retreat when he sustained a lethal gunshot wound to the back of his head.[16]
Additionally, while Defendant argues that the victim’s hands tested a “presumptive positive” for gunshot residue, which he believes confirms his theory of self-defense, Colonel Scanlan discussed gunshot residue procedures and expert studies, noting that gunshot residue can be found on a victim who is as far as 20 feet away from his shooter and that a victim who has suffered multiple gunshot |16wounds increases the possibility that gunshot residue will be found on that person. He further testified that it is expected for a victim of a shooting to have gunshot residue on their hands or person. Here, it was opined that the victim was shot at a distant range, i.e. greater than three feet depending on the weapon used. Also, there were no firearms found on the victim or near the scene of the crime, and there was no testimony that a gun was ever seen or drawn by the victim.
Defendant, however, contends that Edmonson’s testimony established that the “whole neighborhood” was trying to harm Defendant, and that the victim was “clutching something” believed to be a weapon at the time he was shot. However, in his statement, Edmonson did not tell the police that the victim had a gun on the night of the murder, or that the victim was reaching for a gun in a threatening manner.[17] Rather, Edmonson told the police that Defendant had “tripped out.” Ed-monson also testified that Defendant threatened the victim earlier on the day of the shooting concerning his missing gun clip and testified that, despite their alleged fear of the people in the neighborhood, they still arranged a face-to-face drug transaction with the victim. “The law does not permit an individual to track down his enemy, shoot him with a firearm, and then claim justification for the homicide because of prior threats.” State v. Patterson, 10-415 (La.App. 5 Cir. 1/11/11); 63 So.3d 140, 151, writ denied, 11-0338 (La.6/17/11); 63 So.3d 1037 (citing State v. Arabie, 496 So.2d 554, 558 (La.App. 1st Cir.1986), writ denied, 502 So.2d 565 (La.1987)).
The only testimony that supports Defendant’s theory of self-defense is his own self-serving statement and that of his friend Edmonson, who changed his testimony on the day of trial because his “memory had improved.” The credibility |17of a witness is within the sound discretion of the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness; therefore, the credibility of *214 witnesses will not be reweighed on appeal. State v. Macon, 06-0481 (La.6/1/07); 957 So.2d 1280, 1285-86; State v. Rowan, 97-21 (La.App. 5 Cir. 4/29/97); 694 So.2d 1052, 1056. Here, the jury was faced with making a credibility determination when presented with Defendant’s statements and Edmonson’s trial testimony and prior police statement.
At trial, the evidence presented established that Defendant provided two conflicting statements to the police. In his first statement, he denied shooting the victim. In his second statement, only after having been presented with additional evidence concerning the crime, Defendant explained to the police that he shot the victim in self-defense.[18] And, although Defendant stated that he “backed up” and shot the victim when the victim tried to take his gun and money, Edmonson did not corroborate Defendant’s robbery account. Edmonson claimed that the victim had his own gun which he began “clutching” after threatening Defendant about the missing gun clip.
Additionally, Defendant admitted that he fled the scene and disposed of the weapon. It can be argued Defendant’s flight from the scene after the incident is inconsistent with a theory of justifiable homicide. See State v. Wallace, 612 So.2d 183, 191 (La.App. 1st Cir.1992), writ denied, 614 So.2d 1253 (La.1993). A defen dant’s flight and attempt to avoid apprehension are circumstances from which a trier of fact may infer a guilty conscience. State v. Cazenave, 00-183 (La.App. 5 Cir. 10/31/00); 772 So.2d 854, 860, writ denied, 00-3297 (La.10/26/01); 799 So.2d 1151. Furthermore, Defendant’s lack of remorse was evidenced through a text message De-fendant sent during the early morning hours after the shooting in |iswhich he wrote: “[m]y day wasn’t so bad after all. I got mines [sic] back and did that like done dotta [sic] (lol). But holla [sic] at me tomorrow.”
The evidence presented at trial tends to suggest that Defendant was upset with the victim for stealing his gun clip. William Walker testified that he overheard Defendant bragging that he had “killed somebody because they stole something from him, and he’d kill again if somebody else steals something from him.” Defendant and Edmonson arranged to meet the victim under the guise of a drug deal, at which time Defendant shot the victim and took his drugs.[19]
After listening to the testimony and considering the evidence, the jurors clearly found the testimony offered by the State’s witnesses to be more credible than the testimony of the defense witnesses and did not believe Defendant committed the homicide in self-defense. The jury is the ultimate fact-finder in determining whether a defendant proved his condition and whether the State negated the defense beyond a reasonable doubt. State v. Hyman, 09-409 (La.App. 5 Cir. 2/9/10); 33 So.3d 271, 278, writ denied, 10-0548 (La.10/1/10); 45 So.3d 1094 (citing Theriot, supra).
Therefore, we find that the State adequately negated the defense of justification beyond a reasonable doubt. Accordingly, we further find that a rational fact-finder, after viewing the evidence in the light most favorable to the prosecution, could have found beyond a reasonable doubt that the homicide of the victim was not committed in self-defense.

*215
Assignments of Error Numbers Two and Three

In his second and third assignments of error, Defendant argues the State and the trial court committed reversible error by requesting and permitting the release 119of Edmonson’s grand jury testimony in violation of La.C.Cr.P. art. 434.[20] Defendant contends that the release of the grand jury testimony does not fall within the two exceptions to the requirement for secrecy of grand jury proceedings. Specifically, Defendant asserts that it was error for the State to release Edmonson’s grand jury testimony to impeach Edmonson’s trial testimony. Additionally, Defendant alleges that after having “released and used” the grand jury testimony at trial, the trial court erred in denying defense counsel’s request that the entire grand jury transcript be published to the jury. Defendant contends that the denial of the introduction of the entire grand jury transcript allowed the jury to view a portion of Edmonson’s prior statement out of context which created unfair prejudice. Defendant further asserts that the State failed to meet its burden of showing a compelling necessity to publish Edmonson’s grand jury testimony; thus, its release constituted an abuse of the trial court’s discretion. Defendant concludes that the trial errors concerning Edmonson’s grand jury testimony warrants a reversal of Defendant’s conviction.
At trial, before Edmonson was called to testify, a bench conference was held:
THE STATE: Judge, based on Mr. Ed-monson’s statements to me,[21] I’m asking that you order me to hand over the Grand Jury testimony. I think he is intending to change his testimony about whether or not the victim had a gun and what happened. So, I’m just asking will you order that so they can have it?
UnTHE COURT: So ordered.
THE STATE: All right.
DEFENSE: Can we recess?
* * *
DEFENSE: Can we have ten minutes to review it, Judge?
THE COURT: Yes.
A recess was taken after which the State called Edmonson to the stand. On re-direct examination, a second bench conference was held concerning Edmonson’s testimony adduced on direct and cross-examination. Believing Edmonson to have provided inconsistent testimony regarding the victim’s alleged possession of a gun on the night of the shooting, the State sought to use Edmonson’s grand jury testimony to impeach him at trial:
THE STATE: Judge, I believe Mr. Ed-monson has contradicted testimony in his Grand Jury, and I’m seeking to impeach him with it.
*216 DEFENSE: I have no objection. If they want to use the Grand Jury, I’d ask that the whole of the testimony be admitted. Because if you read things out of context, it might be contradictory; but, if you read it as a whole, it’s not.
THE STATE: Judge, I think it’s a pretty straight forward question: Did you see any weapons on Prentis Perry when he was shot? Not that night, no. Did he pull any weapons on Pham? No.
DEFENSE: He never saw it. That’s the same thing he said here. That’s what he said. Not that night.
THE STATE: No, today he has said there’s an outline and something, or he was gripping, and all that.
DEFENSE: He didn’t say that, at all. He didn’t say that, at all.
j2J*
THE COURT: His testimony was that he was gripping his waistband, reaching. He didn’t say he saw the weapon. I think that was his testimony.
THE STATE: Can I just ask him?
THE COURT: Let me tell you this. If you renew your request,[22] I’ll grant it. I mean I think that he has gone well beyond—
[[Image here]]
THE COURT: He’s gone well beyond the limit of showing that he’s uncooperative in answering direct questions.
[[Image here]]
THE COURT: And I’m going to allow the DA, if he requests ...
DEFENSE: To ask leading questions?
THE COURT: Yes.
THE STATE: Well, I’ll make that motion now, Judge.
DEFENSE: Note our objection.
THE COURT: I mean you didn’t know he had been asking leading questions for the last—
DEFENSE: I told the jury I’d respect your decisions, and so I will. Just note my objection.
THE COURT: All right. So ordered.
(END OF BENCH CONFERENCE)
THE COURT: All right. Pursuant to Code of Evidence Article 611—
THE STATE: Just for the Record, the State’s moving to have the witness declared hostile so I can lead him.
THE COURT: Pursuant to 611(C) of the Code of Evidence, I’m granting, your request. And I note Mr. DeSal-vo’s objection.
[saThe State then went on to ask Ed-monson about whether he saw any weapons on the victim on the night of the shooting, and whether he saw the victim pull a weapon on Defendant that night. Edmonson answered “no” to both of the State’s questions; thus, the State did not utilize Edmonson’s grand jury testimony for impeachment purposes.
After the conclusion of the trial testimony and prior to publishing the trial exhibits to the jury, the trial judge went through each piece of evidence with the State and defense counsel to ensure that any objections regarding the evidence had been lodged prior to their publication. The grand jury testimony was never admitted into evidence nor published to the jury.
As an initial note, Defendant did not preserve this issue for review on appeal. At trial, defense counsel did not object to the State’s request to use Ed- *217 monson’s grand jury testimony for impeachment purposes. In fact, Defendant stated that he had “no objection,” and further requested that the entire transcript be admitted into evidence.
The contemporaneous objection rule provides that “[a]n irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence.” La.C.Cr.P. art. 841. The purpose behind the contemporaneous objection rule is to put the trial judge on notice of an alleged irregularity, allowing him the opportunity to make the proper ruling and correct any claimed prejudice to the defendant. This prevents the defendant from gambling for a favorable verdict at trial and then later utilizing appellate review to correct errors that might easily have been corrected by the trial judge. State v. Williams, 04-608 (La.App. 5 Cir. 11/30/04); 889 So.2d 1093, 1100, writ denied, 05-0081 (La.4/22/05); 899 So.2d 559.
12sHere, we find that because Defendant did not object to the use and/or attempted introduction of Edmonson’s grand jury testimony, the issues raised in Defendant’s second and third assignments of error have not been properly preserved for this Court’s consideration. (See La.C.Cr.P. art. 841; State v. Mitchell, 11-1018 (La.App. 5 Cir. 6/28/12); 97 So.3d 494, 498-99, where this Court found that because the defendant did not contemporaneously object to the testimony of a witness concerning other crimes evidence, the issue was not properly preserved for this Court’s consideration; Matthews v. Breaux, 04-958 (La.App. 5 Cir. 2/15/05); 896 So.2d 1146, 1150, where this Court found that a rule of evidence not invoked is waived, and, hence, a failure to object to evidence waives the objection to its admissibility; and State v. Whatley, 320 So.2d 123 (La.1975), finding, as no objection was made by defense counsel at the time the prosecutor, in closing argument, referred to the testimony of a trial witness before the grand jury, the non-prejudicial error, if any, was waived by the failure to object under La. C.Cr.P. art. 841.)

Assignments of Error Numbers Four and Five

In his fourth and fifth assignments of error, Defendant argues that Edmonson’s transcribed statement provided to the police prior to trial was improperly admitted and published to the jury without the proper authentication requirements set forth in La. C.E. art. 901(A). Defendant also contends that the court erred in denying his request to introduce the entire police statement under the principle of completeness to rebut the adverse inferences created by the State. Specifically, Defendant asserts that the failure to admit Edmonson’s complete statement into evidence denied the jury the opportunity to fully and objectively evaluate the credibility of a critical witness, which he concludes denied him a fair trial.
|?4Puring direct examination, Edmonson was impeached several times with his transcribed police statement taken prior to trial. Specifically, Edmonson’s trial testimony differed from his statement on various issues: (1) whether he was aware that Defendant was carrying a gun in the backseat of his car; (2) from whom the Defendant had obtained the gun; (3) and whether he knew Defendant was going to shoot the victim. Impeachment through the use of his prior statement was permitted without objection. On cross-examination the defense attorney was given the opportunity to rehabilitate Edmonson.
Additionally, on cross-examination, Ed-monson was asked how he and Defendant had encountered the victim on the night of the shooting. Edmonson testified he did not call the victim and was unsure whether Defendant called the victim. Edmonson *218 further testified that he was unsure whether a phone call was made to the victim or if they just happened to run into the victim on the street because they lived in the same neighborhood. Thus, on re-direct examination, the State again attempted to impeach Edmonson’s inconsistent trial testimony by utilizing his transcribed statement:
THE STATE: And I need to clear this up. Did you or did you not call P.J. to come meet you all?
WITNESS: I did not call P.J. to come meet us.
THE STATE: State’s Exhibit 34, Page 10, second line down. Do you remember when Solomon Burke asked you this? Do you see this?
WITNESS: That was worrying when I told them.
THE STATE: And do you remember—
THE STATE: Publishing State’s Exhibit 32, Judge.
THE COURT: 34.
THE STATE: 34. I’m sorry I keep doing that.
125WITNESS: To be honest, perfectly ■ honest with you, I was like unclear how that came about.
THE COURT: Any objection, Mr. DeS-alvo?
DEFENSE: I’m just preparing to object.
THE COURT: Well, he’s asking it be—
THE STATE: Move to publish State’s Exhibit 34.
DEFENSE: You want to introduce the whole statement?
THE STATE: No, just the line I’m impeaching him on.
DEFENSE: If you want to introduce it, I want the whole statement in. Because you’re taking it out of context. That’s a leading question that’s asked by the police officer.
[[Image here]]
DEFENSE: So, if you want to introduce that with the leading question from the police officer, we have no objection.
THE STATE: Judge, I asked a leading question, he gave me a different answer. I think I can give him the same leading question that he’s changed in front of this jury today in a murder trial.
THE COURT: So ordered.
The State then asked Edmonson the same question Detective Burke asked him during his interview:
THE STATE: All right. And he asked you: So you all called him? And you said: Yeah, we had called him. Right? That’s what you told the police that night, right?
WITNESS: I just told them whatever. I don’t know — I wasn’t clear—
THE STATE: Because they were beating on you?
WITNESS: Huh?
THE STATE: Because they were beating on you?
__[2gWITNESS: Not even just that. I was really unclear on how we came about to meeting him.
After the conclusion of the trial testimony and prior to publishing the trial exhibits to the jury, the trial judge went through each piece of evidence with the State and defense counsel to ensure that any objections regarding the evidence had been lodged prior to their publication. When they reached State’s Exhibit 34 — Edmon-son’s statement — the trial judge stated, “[tjhen we have State’s Exhibit 34 which was identified but only portions were introduced. That was the Edmonson tran *219 scripts, so that’s not going in.” The following colloquy ensued:
DEFENSE: Judge, we’ll move it, the Edmonson transcript. Is that Number 34?
THE STATE: Yes.
DEFENSE: The entire transcript.
THE STATE: That’s correct.
[[Image here]]
THE COURT: No. No transcript was introduced.
DEFENSE: I objected to that being introduced unless they introduce the whole transcript.
THE COURT: He didn’t introduce it. That’s what I’m saying. He only used—
DEFENSE: Well, I still have my case I can use.
THE COURT: He didn’t introduce it. He only used portions of it to cross. So you’ve got 35 as a cell phone ...
Prior to resting his case, Defendant requested a stipulation to Edmonson’s transcribed statement. Defendant argued that the entire statement should come in under the doctrine of completeness. The State argued that if a witness is impeached, the entire statement is not introduced into evidence. Thus, the State objected to the introduction of Edmonson’s statement, arguing that the entire ^statement constituted inadmissible hearsay. Prior to ruling, the trial court noted that Defendant had the opportunity to question Edmonson about the portions of his statement that corroborated his trial testimony. The trial court further noted that the State only used portions of Edmonson’s statement to impeach his inconsistent testimony, stating that such use of the statement does not indicate that the entire transcript must be introduced. Thus, the trial court sustained the State’s objection to the admission of the statement.
In the present matter, although Defendant claims on appeal that the trial court improperly admitted and published portions of Edmonson’s statement to the jury without first meeting the authentication requirements provided under La. C.E. art. 901(A), the record shows Defendant did not object on that basis. In fact, defense counsel requested that the entirety of Edmonson’s statement be admitted. Accordingly, given the well settled rule that a new basis for an objection may not be urged for the first time on appeal, we find Defendant waived any claim based on admission of this evidence for lack of authentication.[23] (See, State v. Holmes, 06-2988 (La.12/2/08); 5 So.3d 42, 69-70, cert. denied, 558 U.S. 932, 130 S.Ct. 70, 175 L.Ed.2d 233 (2009), finding the record showed the defendant did not object to the introduction of the document on *220 the basis raised for the first time on appeal and, thus, waived any claim based on admission of the evidence. Citing, State v. Sims, 426 So.2d 148, 155 (La.1983); State v. Stoltz, 358 So.2d 1249, 1250 (La.1978); State v. Ferguson, 358 So.2d 1214, 1220 (La.1978)).
IjaNext, Defendant argues that Edmon-son’s entire statement, not just the portions that were used for impeachment purposes, should have been admitted into evidence. First, Edmonson’s transcribed police statement was never admitted into evidence. It was through Edmonson’s trial testimony that he was impeached with portions of his statement. Defense counsel never objected to the admission or use of the portions of Edmonson’s statement for impeachment purposes. Rather, Defendant objected to the denial of his request that the entire statement be admitted. Defendant argued that Edmonson’s entire statement should have been admitted under the principle of completeness, so that the jury could have also seen the portions of Edmonson’s statement that corroborated his testimony.
A hearsay statement is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. La. C.E. art. 801(C); State v. King, 355 So.2d 1305 (La.1978). Hearsay is generally not admissible, unless subject to an exception found in the Code of Evidence or provided for by the legislature. La. C.E. art. 802. Two important hearsay exceptions encompass testimony given at trial that is inconsistent with prior statements made by the witness.
The credibility of a witness may be attacked by any party. La. C.E. art. 607(A). A witness’ prior inconsistent statement may be used to impeach his credibility. See State v. Johnson, 01-0842 (La.App. 5 Cir. 2/13/02); 812 So.2d 106, 115, writ denied, 02-1037 (La.3/21/03); 840 So.2d 532.
Specifically, La. C.E. art. 607 provides, in pertinent part:
D. Attacking credibility extrinsically. Except as otherwise provided by legislation:
(1) Extrinsic evidence to show a witness’ bias, interest, corruption, or defect of capacity is admissible to attack the credibility of the witness.
129(2) Other extrinsic evidence, including prior inconsistent statements and evidence contradicting the witness’ testimony, is admissible when offered solely to attack the credibility of a witness unless the court determines that the probative value of the evidence on the issue of credibility is substantially outweighed by the risks of undue consumption of time, confusion of the issues, or unfair prejudice.
If the witness has had a fair opportunity “to admit the fact and has failed distinctly to do so,” extrinsic evidence of a prior inconsistent statement is admissible, not to prove the truth of the matter asserted, that is, not for its hearsay content, but to establish the fact of contradiction as a means of impeaching a witness’ general credibility. State v. Owunta, 99-1569 (La.5/26/00); 761 So.2d 528, 529 (per curiam).[24] However, if the witness admits *221 the statement, he has impeached himself by his own testimony, and thus, the statement is inadmissible. Johnson, supra.
The Supreme Court has outlined the balancing test to be applied when prior inconsistent statements are used to impeach credibility:
The right to use the prior statement depends upon the probative value of the statement as to the credibility of the witness’ in-court testimony, as measured against the prejudicial impact that potentially may result from the jury’s improper use of the evidence. In performing the weighing process, the court should consider the relevancy of the pri- or statement to the credibility of the in-court testimony and the motivation for the impeachment. The court should further consider the prejudicial effect of the statement if used improperly as substantive evidence, and the effectiveness of a limiting instruction in avoiding improper use of the statement. (Internal quotations omitted).
State v. Cousin, 96-2973 (La.4/14/98); 710 So.2d 1065, 1071.
|.^^Additionally, La. C.E. art. 613 provides:
Except as the interests of justice otherwise require, extrinsic evidence of bias, interest, or corruption, prior inconsistent statements, conviction of crime, or defects of capacity is admissible after the proponent has first fairly directed the witness’ attention to the statement, act, or matter alleged, and the witness has been given the opportunity to admit the fact and has failed distinctly to do so.
In State v. Jones, 263 La. 1012, 270 So.2d 489 (1972), the State was permitted to impeach the defendant on direct examination after laying the proper foundation as to asserted inconsistencies between his trial testimony and his recorded grand jury testimony, and was also permitted to attempt further impeachment, in the event it was warranted, on the basis of any other inconsistencies, which might develop between the defendant’s testimony on cross-examination and his testimony previously given to the grand jury. At trial, the defendant objected not on the basis that the State should not be permitted to utilize isolated portions of the defendant’s prior testimony to impeach him, but rather objected on the basis that the defendant’s entire testimony before the grand jury should be admitted into evidence. The trial court overruled the defendant’s objection.
On appeal, the defendant argued that the trial court’s refusal to permit the utilization of the entire grand jury testimony was prejudicial and violative of the provisions of La. R.S. 15:450.[25] The Louisiana Supreme Court held that the defendant suffered no prejudice by the trial court’s ruling. The Court explained that only a small part of the grand jury testimony was used for the purpose of impeachment, and *222 that the defense counsel could have employed any part of the grand jury testimony he desired to use. The Court further noted that no partiality was shown to the State.
|31The record in this case evidences that Edmonson was properly impeached with his prior inconsistent police statement. Edmonson admitted that he gave a false statement to the police, identified the statement taken by Detective Burke, was presented with the conflicting account of events, and was given a chance to explain or deny the inconsistencies.
Moreover, as in Jones, supra, only a small part of Edmonson’s statement was used for impeachment purposes. Defendant has failed to establish how the denial of the utilization of Edmonson’s entire statement caused him prejudice. Defense counsel was given the opportunity to rehabilitate Edmonson on cross-examination regarding any explanation or consistencies contained in his statement as compared to his trial testimony. Additionally, prior to denying Defendant’s request to admit Ed-monson’s entire statement, the trial court noted that Defendant had the opportunity to question Edmonson about the portions of his statement that corroborated his trial testimony. No partiality was shown to the State. Furthermore, it is noted that Ed-monson testified prior to Defendant putting on his case, thus, defense counsel was permitted to utilize Edmonson’s statement in his case as he deemed fit and could have elicited testimony that showed the substance of Edmonson’s police statement was largely consistent with his trial testimony.[26] Although the State bears the burden of proof at trial, it is noted that Defendant did not call any witnesses.
| ^Accordingly, we find that Defendant suffered no prejudice by the trial court’s denial of his request to introduce the entirety of Edmonson’s statement into evidence.

Assignments of Error Numbers Six and Seven

In his sixth and seventh assignments of error, Defendant argues that his 35-year sentence for manslaughter is excessive when; 1) he had no criminal history; 2) the district attorney chose to prosecute him for second degree murder, and the jury returned a responsive verdict of manslaughter; and 3) he received a sentence which is over 85% of the maximum possible sentence allowable under the law. Defendant contends that by sentencing him to 35 years, the trial court placed him in the category of “worst possible offenders,” which he is not. Defendant argues that the trial court should have considered certain mitigating factors under La.C.Cr.P. art. 894.1 when sentencing him because they establish that he does not fall within the most egregious offender category. Defendant further maintains that his conduct is not as severe as other individuals similarly situated. Defendant also contends that the trial court failed to consider witness testimony that supports his theory of self-defense, which he believes establishes a lack of justification for his legally excessive sentence.
*223 After the court sentenced Defendant to 35 years at hard labor, defense counsel orally objected to the sentence as excessive. The record also reflects that after sentencing, Defendant filed a written motion to reconsider sentence pursuant to La.C.Cr.P. art 881.1, based on the alleged excessiveness of his sentence. However, Defendant did not urge any specific grounds in support of his objection at the sentencing hearing or in his written motion. The failure to state specific grounds upon which a motion to reconsider sentence is based limits a defendant to |S3a review of his sentence for constitutional excessiveness only.[27] State v. Warmack, 07-311 (La.App. 5 Cir. 11/27/07); 973 So.2d 104, 108. Additionally, Defendant did not raise the issue of the trial judge’s failure to consider pertinent mitigating factors under La. C.Cr.P. art. 894.1 at the trial court level. As such, to the extent that Defendant argues that the judge failed to articulate his reasons for sentencing pursuant to La.C.Cr.P. art. 894.1, Defendant is precluded from raising such an issue on appeal.[28] See State v. Declouet, 09-1046 (La.App. 5 Cir. 10/12/10); 52 So.3d 89, 105, writ denied, 10-2556 (La.4/8/11); 61 So.3d 681; State v. Ridgley, 08-675 (La.App. 5 Cir. 1/13/09); 7 So.3d 689, writ denied, 09-0374 (La.11/6/09); 21 So.3d 301.[29] Accordingly, the only issue to be considered herein is whether the trial court erred in denying Defendant’s motion to reconsider sentence based on constitutionally excessiveness.
The Eighth Amendment to the United States Constitution and Article I, § 20 of the Louisiana Constitution prohibit the imposition of excessive punishment. Although a sentence is within statutory limits, it can be reviewed for constitutional excessiveness. State v. Smith, 01-2574 (La.1/14/03); 839 So.2d 1, 4. A sentence is considered excessive if it is grossly disproportionate to the offense or imposes needless and purposeless pain and suffering. Id. A sentence is grossly disproportionate if, when the crime and punishment are considered in light of the harm done to society, it shocks the sense of justice. State v. Lawson, 04-334 (La.App. 5 Cir. 9/28/04); 885 So.2d 618, 622.
| S4A trial judge has broad discretion when imposing a sentence and a reviewing court may not set a sentence aside absent a manifest abuse of discretion. The issue on appeal is whether the trial court abused its discretion, not whether another sentence might have been more appropriate. State v. Dorsey, 07-67 (La.App. 5 Cir. 5/29/07); 960 So.2d 1127, 1130. The appellate court shall not set aside a sentence for excessiveness if the record supports the sentence imposed. State v. Pearson, 07-332 (La.App. 5 Cir. 12/27/07); 975 So.2d 646, 656. In reviewing a trial court’s sentencing discretion, three factors are considered: 1) the nature of the crime; *224 2) the nature and background of the offender; and 3) the sentence imposed for similar crimes by the same court and other courts. Id., 07-332 at 15-16; 975 So.2d at 656. Generally, the maximum sentences are reserved for cases involving the most serious violations of the offense charged and the worst type of offender. Id., 07-332 at 16; 975 So.2d at 656.
Defendant was originally charged with second degree murder, but convicted by a jury of the lesser offense of manslaughter. Manslaughter is punishable by not more than 40 years. La. R.S. 14:31. Defendant received a near maximum sentence of 35 years. Prior to sentencing Defendant, the trial court listened to a victim impact statement from Nicole Perry Howard, the victim’s mother. Ms. Howard stated that Defendant, her only son, was 23 years old when he was killed. Ms. Howard stated that her son has two children who were four and five years old and will never see their father again. Ms. Howard told the court how her son touched the lives of many people through his dancing. Ms. Howard explained that when she moved to Terrytown from Slidell she thought she had moved to a very nice neighborhood. Ms. Howard stated that her son came to live with her and started working at Popeye’s, so that he could be closer to his children. She explained that her son began to associate with the wrong people and got into some trouble so she |RKtold him that, in order to continue living with her, he had to go to school. Ms. Howard stated that her son started going to the Hope Center and never missed a day of school. She further stated that her son received certificates from the school. Ms. Howard asked the trial court to sentence Defendant to the maximum possible term of imprisonment because of the senseless killing of her son.
Defense counsel then made a brief statement to the court, stating that Defendant was 19 years old and had no criminal history. The State then argued that Defendant shot the victim nine times, at least three of which were in the back. The State further submitted that communications with Defendant display a lack of remorse and understanding of the gravity of the offense.
The trial court sentenced Defendant to 35 years, the near maximum term of imprisonment for his manslaughter conviction, reasoning as follows:
I’ve listened to the testimony of the victim’s mother, and I sat through the trial. And the jury found you guilty of a responsive verdict, manslaughter. And I want to say that I have had a serious and lengthy discussion with counsel, and I’ve listened to all of his arguments. And I am compelled to follow 894.1 of the Code of Criminal Procedure when it comes to sentencing guidelines. And I have, in fact, considered it.
The penalty ranges from ten to forty years at hard labor. And I do believe that there is a need for correctional treatment in a custodial environment; I also believe that a lesser sentence would deprecate the seriousness of the offense. And I have considered the following grounds, and it shall be afforded weight as the Code provides.
I do find that the offense as committed was manifestly deliberate cruelty to the victim. The testimony is quite clear that the victim received seven shots, four to the front of his torso and three to the back. One of those three was through and through from almost the dead center of the back, through the front, and exiting near the center or bridge of his nose. I find that there was actual violence in the commission of the offense, that there is permanent injury *225 to the victim’s family ... I also find that there was a dangerous weapon used in the commission of the offense. Also, I find that there was foreseeable endangerment of human life by discharging the firearm on that night.
|ar,I will admit, from the mitigating standpoint, I’ve considered your criminal history, which was nonexistent, and I’ve considered your youth. You were nineteen years old at the time.
The facts that I take into consideration, and I find them compelling ... [30]it was quite apparent that the victim was attempting to retreat, to get away. Because there’s no other explanation ... There was absolutely no testimony that a gun was ever drawn by the victim, or any type of weapon was found on the victim’s body, nor any other evidence of a drug transaction. I know there was testimony about him clutching, I think was the term, but I want the appellate court to be very certain when looking at the evidence, the photograph of the victim as he lay on the ground, as is customary for folks of that age, and it’s a fashion style I don’t understand, the pants were very low on the ground, so low that almost his entire backside and his boxer shorts were hanging out. So, it’s not beyond question that you would have to reach or clutch to keep your pants from falling down.
Also, your testimony was quite clear your weapon was in a pocket of the pants you were wearing. We don’t have a scenario where you were armed with a side arm in a holster that is quickly retrievable, you had to reach into your pants, you had to pull that out. And while those seconds may be negligible to some, when this whole thing is going down, it’s like time is frozen. There was never any testimony that the victim in any way attempted to reach in, pull a weapon, pull a knife, pull anything, a gun, nothing.
... When you boil it all down, best case scenario, either you were upset with your gun or magazine being taken, or there was a drug deal gone bad. But, despite all of that, if that’s the catalyst for the crime, it makes no sense to me, absolutely none.
I will also say that I listened to your first statement, which was very cool, very calm, well thought out. And I make note that your second statement, where you confessed to the shooting, was only after additional evidence was gathered, and it was apparent to you that they had had additional statements that made reference to your participation in the crime.
Based upon the facts of this case and the sentences imposed in comparable cases where similar sentences were imposed on similarly situated defendants, Defendant’s 35-year sentence falls within the jurispru-dentially accepted range and is not constitutionally excessive.
| S7The record reflects that in sentencing Defendant, the trial court considered Ms. Howard’s impact statement, the fact that Defendant was found guilty of the responsive verdict of manslaughter, the sentencing guidelines set forth under La.C.Cr.P. art. 894.1, Defendant’s need for correctional treatment in a custodial environment, and the fact that a lesser sentence would depreciate the seriousness of the offense. The trial court noted that the offense committed was especially cruel as evidenced by the multiple gunshot wounds the victim sustained to the front and back of his body. The trial court further noted that *226 the instant offense was a crime of violence committed with a dangerous weapon, where endangerment to human life was foreseeable and from which the victim’s family has suffered permanent injury. The trial court explained that it considered the mitigating factors, including Defendant’s young age and absence of a criminal record; however, based on the testimony presented at trial which disproved Defendant’s theory of self-defense, the court found the crime to be senseless. The court further noted that Defendant originally denied his participation in the crime, but only later confessed to shooting the victim after additional evidence was gathered that proved Defendant’s participation in the crime.
Moreover, the evidence adduced at trial would have supported a second degree murder verdict, and the exposure to a mandatory life sentence. La. R.S. 14:30.1. And, although Defendant contends that the jury’s finding of guilt to the lesser charge of manslaughter indicates that the shooting was caused by provocation, evidence presented at trial established that Defendant had the specific intent to kill the victim, or at the very least inflict great bodily harm;[31] accordingly, the responsive verdict of manslaughter was a compromise and valid verdict under the law.
[ ^Louisiana courts have found that the fact that the evidence might have supported a verdict of second degree murder is an appropriate sentencing consideration where the defendant has been convicted of the lesser offense of manslaughter.[32] See State v. Roussel, 424 So.2d 226, 231-32 (La.1982), overruled on other grounds by State v. Jackson, 480 So.2d 263, 268; State v. Wooden, 572 So.2d 1156, 1161 (La.App. 1 Cir.1990). In the present case, although Defendant was sentenced to 35 years for manslaughter, his sentence term falls short of the life imprisonment the Louisiana legislature has deemed adequate to describe the moral culpability of his conduct.
Also, with respect to Defendant’s 35-year sentence, the jurisprudence reflects that harsher sentences have been imposed in similar circumstances despite the jury’s finding of the lesser responsive verdict of manslaughter.
In Batiste, 06-869 at 6-7; 958 So.2d at 27-28, this Court found a 40-year sentence *227 for manslaughter was not constitutionally excessive where the defendant, who was 24 years old at the time of sentencing, deliberately pointed a gun at the victim and shot him four times without provocation, and the defendant’s actions endangered the lives of two bystanders. As in the instant case, the defendant in Batiste was originally charged with second degree murder, and was found guilty of the lesser offense of manslaughter.
In State v. Jones, 05-735 (La.App. 5 Cir. 2/27/06); 924 So.2d 1113, 1118-19, writ denied, 07-0151 (La.10/26/07); 966 So.2d 567, this Court found a 40-year sentence for manslaughter was not constitutionally excessive, where the defendant had armed himself prior to the killing because of a previous confrontation "with the victim, the defendant shot the victim four times in the face, and the defendant fled the state after the shooting. This Court also took into consideration that the defendant was charged with second degree murder, and was found guilty of the lesser offense of manslaughter.
In Jones, this Court relied on State v. Lanieu, 98-1260 (La.App. 1 Cir. 4/1/99); 734 So.2d 89, 90-91, writ denied, 99-1259 (La.10/8/99); 750 So.2d 962, in which the First Circuit upheld a 40-year manslaughter sentence. In that case, the 19-year-old defendant, a first time offender, was charged with second degree murder and convicted of manslaughter. The defendant shot the victim in the head twice after a heated argument ensued in front of the defendant’s home.
In State v. Hyman, 09-409, (La.App. 5 Cir. 2/9/10); 33 So.3d 271, writ denied, 10-0548 (La.10/1/10); 45 So.3d 1094, this Court found no error in the trial court’s broad discretion in imposing a 40-year sentence on the defendant who was initially charged with second degree murder, but ultimately convicted of manslaughter. At sentencing, the trial court noted that the defendant created a risk to more than one person by firing on the victim, and that any lesser sentence would deprecate the seriousness of the offense. On appeal, this Court noted that the record revealed sufficient evidence to support a conviction for second degree murder. Further, as the sentencing judge noted, this Court took notice of the fact that the defendant had an opportunity to withdraw from the confrontation, but he did not, and that the defendant was not acting in self-defense.
|4f)In light of the facts of this case, the nature of the crimes, and the jurisprudence, we hold that the trial court did not err in denying Defendant’s motion to reconsider sentence, finding that the 35-year sentence imposed for Defendant’s manslaughter conviction is not constitutionally excessive. By finding that the trial court did not abuse its discretion, we affirm Defendant’s sentence and conclude that the imposed sentence is neither grossly disproportionate to the severity of the offense nor shocking to our sense of justice.

ERROR PATENT DISCUSSION

The record was reviewed for errors patent, according to LSA-C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); State v. Weiland, 556 So.2d 175 (La.App. 5th Cir.1990).
Although the commitment reflects that Defendant was given a proper advisal of the time period for seeking post-conviction relief as required by La.C.Cr.P. art. 930.8, the transcript indicates an incomplete advisal. Specifically, the transcript indicates that the trial court advised Defendant that “you’ve got two years after judgment and conviction becoming final to seek post-conviction relief.” (emphasis added). The transcript prevails when there is a discrepancy between the commitment and the transcript. State v. Lynch, 441 So.2d 732, 734 (La.1983). It is *228 well settled that if a trial court fails to advise, or provides an incomplete advisal, pursuant to La.C.Cr.P. art. 980.8, the appellate court may correct this error by informing the defendant of the applicable prescriptive period for post-conviction relief. See State v. Neely, 08-707 (La.App. 5 Cir. 12/16/08); 3 So.3d 532, 538, writ denied, 09-0248 (La.10/30/09); 21 So.3d 272; State v. Davenport, 08-463 (La.App. 5 Cir. 11/25/08); 2 So.3d 445, 451, writ denied, 09-0158 (La.10/16/09); 19 So.3d 473; State v. Jacobs, 07-887 (La.App. 5 Cir. 5/24/11); 67 So.3d 535, writ denied, 11-1753 (La.2/10/12); 80 So.3d 468; State v. Taylor, 12-25, (La.App. 5 Cir. 6/28/12); 97 So.3d 522, 538; and State v. Brooks, 12-226 (La.App. 5 Cir. 10/30/12); 103 So.3d 608.
Accordingly, we advise Defendant by way of this opinion that no application for post-conviction relief, including applications which seek an out-of time appeal, shall be considered if it is filed more than two years after the judgment of conviction and sentence has become final under the provisions of La.C.Cr.P. arts. 914 or 922.

DECREE

For the foregoing reasons, we affirm Defendant’s conviction and sentence.

AFFIRMED

. Terrytown is located in Jefferson Parish.

. Edmonson further testified that, after the shooting, he gave two statements to the police. In the first statement, Edmonson told the police that Defendant had a gun in the backseat of his car at the time they were giving the victim a ride to Leige's house.

. Edmonson testified that Defendant also asked Leige about the missing gun magazine shortly after they dropped the victim off at Leige's house. According to Edmonson, they saw Leige on the street and pulled over to speak with him. While talking to Leige about the missing gun magazine, Edmonson testified that somebody from the neighborhood drove by and threw a McDonald’s cup at Leige; so, Leige reached into Defendant's car, pulled out Defendant’s gun from inside the car and shot at the person that threw the cup. Leige then told Defendant and Edmonson that he would speak to the victim about the missing gun magazine.

. Edmonson further testified that Defendant was stationary when he fired the shots at the victim.

. During direct examination, Edmonson was asked whether Defendant had planned on shooting the victim later that day, to which Edmonson replied:
A: Not just P.J. [the victim], the people out the circle, whoever, because there's too much stuff being said. Q: But please answer this yes or no. Anthony had it on his mind earlier that day that he was going to shoot P.J., correct?
A: Well, I don’t know.
However, when asked the same question by the police at the time he gave his statement, Edmonson replied "Yes, I mean — No. No. No. Like he had it on his mind, but then he told me like, man, I’m not going to do that ... just we'll call it a night.”

. Several calls were made to 911 regarding gunshots fired on Diplomat Street; however, *209 none of the callers witnessed the shooting.

. Captain English also identified the crime scene photographs taken in this matter and discussed the location of the various casings found at the crime scene. Captain English further testified that one particular projectile labeled "J” was located outside the group of the other projectiles.

. Colonel Scanlan also noted that it is possible for a shooter to fire a weapon and test negative for gunshot residue.

. On cross-examination, Colonel Scanlan also discussed firearm projectile patterns, testifying that when a semiautomatic pistol is discharged, the casings generally eject up and to the right, falling to the ground in group or cone patterns.

. On cross-examination, Detective Barteet testified he did not ascertain a record of the phone numbers that called the victim’s phone that night and did not know the content of the victim’s text messages, if any, contained on the phone.

. The identity of the subscriber associated with this telephone number was not determined.

. A map of the cell phone towers that the 7488 number used also appears in the call detail record report and was admitted into evidence.

. This evidence established that a few hours after the murder, Defendant sent a text message to a woman named Meka stating, "[njight love. My day wasn't so bad after all. I got mines back and did that like done dotta (lol). But holla at me tomorrow.”

. Edmonson’s statement was admitted for record purposes only.

. Second degree murder, as it pertains to this case, is defined as the killing of a human being "[w]hen the offender has the specific intent to kill or to inflict great bodily harm[.]” Specific intent is defined as “that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act.” La. R.S. 14:10. The determination of specific criminal intent is a question of fact. State v. Seals, 95-0305 (La. 11/25/96); 684 So.2d 368, 373, cert. denied, 520 U.S. 1199, 117 S.Ct. 1558, 137 L.Ed.2d 705 (1997); State v. Gant, 06-232 (La.App. 5 Cir. 9/26/06); 942 So.2d 1099, 1111, writ denied, 06-2529 (La.5/4/07); 956 So.2d 599.

. See State v. Favorite, 03-425 (La.App. 5 Cir. 11/25/03); 862 So.2d 208, 214, writ denied, 03-3529 (La.4/23/04); 870 So.2d 298, where this Court recognized that the jury could have concluded the victim was the initial aggressor, but the defendant became the aggressor and his claim of self-defense was not supported by the facts of the case, including the findings that at least some of the bullets entered the victim from behind.

. There was also conflicting testimony as to whether the victim typically carried a handgun with him. Edmonson testified that he always carried a handgun, while Leige testified that he had never seen the victim in possession of a firearm.

. Defendant maintained throughout his statement that Edmonson was not present at the time of the shooting.

. Edmonson testified that they obtained the drugs from the victim but never paid him.

. La.C.Cr.P. art. 434(A) provides:
Members of the grand jury, all other persons present at a grand jury meeting, and all persons having confidential access to information concerning grand jury proceedings, shall keep secret the testimony of witnesses and all other matters occurring at, or directly connected with, a meeting of the grand jury. However, after the indictment, such persons may reveal statutory irregularities in grand jury proceedings to defense counsel, the attorney general, the district attorney, or the court, and may testify concerning them. Such persons may disclose testimony given before the grand jury, at any time when permitted by the court, to show that a witness committed perjury in his testimony before the grand jury. A witness may discuss his testimony given before the grand jury with counsel for a person under investigation or indicted, with the attorney general or the district attorney, or with the court.

. It is unknown what discussions Edmonson and the prosecutor had on the day of trial.

. During direct examination of Edmonson, the State requested that Edmonson be declared a hostile witness, which the trial judge originally denied.

. It is noted that despite waiving this argument, the substance of Defendant's contention lacks merit. A proper foundation was laid for the admission of the impeachment testimony by Edmonson himself who admitted that he gave a false statement to the police, identified the statement, was presented with the conflicting account of events, and given a chance to explain or deny the inconsistencies. (See La. C.E. art. 613; La. C.E. art. 801D(l)(a), where a statement is not hearsay when a declarant testifies at trial and is subject to cross-examination concerning the statement, and the statement is inconsistent with his testimony, provided that the proponent has first fairly directed the witness’ attention to the statement and the witness has been given the opportunity to admit the fact and where there exists any additional evidence to corroborate the matter asserted by the prior inconsistent statement; and La. C.E. art. 901, where testimony that a matter is what it is claimed to be is sufficient for authentication.). Thus, Defendant’s assertion that the police officer who took Edmonson’s statement should have been called to authenticate it prior to its alleged admission is unsupported.

. In Owunta, supra, the supreme court stated:
Louisiana has long sanctioned the impeachment of a witness in criminal trials by his or her prior inconsistent statements. La. C.E. art. 607(D)(2); formerly La. R.S. 15:493; State v. Mosely, 360 So.2d 844, 845 (La.1978), provided that the witness has had a fair opportunity “to admit the fact and has failed distinctly to do so," La. C.E. art. 613, extrinsic evidence of the statement is admissible, not to prove the truth of the matter asserted, *221 i.e., not for its hearsay content but, to establish the fact of contradiction as a means of impeaching witness's general credibility. State v. Cousin, 96-2973 (La.4/14/98); 710 So.2d 1065, 1069. In this regard, Louisiana has followed the minority rule that such prior inconsistent statements "simply do not constitute substantive evidence.” State v. Allien, 366 So.2d 1308, 1311 (La.1978); Cf. California v. Green, 399 U.S. 149, 164, 90 S.Ct. 1930, 1938, 26 L.Ed.2d 489 (1970)("[T]here is little difference as far as the Constitution is concerned between permitting prior inconsistent statements to be used only for impeachment purposes, and permitting them to be used for substantive purposes as well.”).

. La. R.S. 15:450 requires that a statement used against a person must be used in its entirety so that the person affected may have the benefit of any exculpation or explanation that the whole statement may afford.

. See also, State v. Jones, 02-908 (La.App. 5 Cir. 2/25/03); 841 So.2d 965, writ denied, 03-0895 (La.9/26/03); 854 So.2d 345 (citing State v. Easter, 32,940 (La.App. 2 Cir. 4/07/00); 756 So.2d 703, writs denied, 00-1321 (La.2/9/01); 785 So.2d 28, 00-2529 (La.6/29/01); 794 So.2d 823), where the court found that, under La. C.E. art. 801D(l)(b), a witness’s prior police statement was not inadmissible hearsay. The defense counsel cross-examined the witness concerning a police statement, alleging that the witness’s trial testimony differed from the statement. Id., 841 So.2d at 976. The State was later allowed to call the officer who took the witness's statement, and elicit testimony that showed the substance of the police statement was largely consistent with the witness’s trial testimony. Id.

. La.C.Cr.P. art. 881.1(E) provides, "[fjail-ure to make or file a motion to reconsider sentence or to include a specific ground upon which a motion to reconsider sentence may be based, including a claim of excessiveness, shall preclude ... the defendant from raising an objection to the sentence or from urging any ground not raised in the motion on appeal or review.”

. See State v. Carter, 07-270 (La.App. 5 Cir. 12/27/07); 976 So.2d 196, 202, where the defendant did not raise the issue of the trial judge’s failure to comply with La.C.Cr.P. art. 894.1, therefore, the defendant was precluded from raising the issue on appeal.

.In any event, this Court has held that where the record clearly shows an adequate factual basis for the sentence imposed, remand is unnecessary even where there has not been full compliance with La.C.Cr.P. art. 894.1. Declouet, 09-1046; 52 So.3d at 106.

. The trial judge went on to discuss in detail the testimony of various witnesses he considered, including the testimony of Ms. Larre, Colonel Scanlan, and Dr. Garcia.

. "Deliberately pointing and firing a deadly weapon at close range are circumstances which will support a finding of specific intent to kill." State v. Batiste, 06-869 (La.App. 5 Cir. 4/11/07); 958 So.2d 24, 27.

. See also State v. Lewis, 09-1404 (La.10/22/10); 48 So.3d 1073, where the Louisiana Supreme Court reinstated the 16-year-old first time offender’s sentence, originally vacated by this Court, finding that the trial court acted within its discretion when it imposed a 30-year sentence for defendant’s manslaughter conviction. In Lewis, a 16-year-old defendant was charged with second degree murder and convicted of the lesser offense of manslaughter. The defendant was sentenced to 30 years imprisonment. The defendant appealed and this Court vacated his sentence despite this Court’s finding that the evidence at trial supported the responsive verdict of manslaughter because it "was sufficient to prove second degree murder.” The Louisiana Supreme Court reversed, noting, that "in considering the nature of the offense, both the trial court and the reviewing court may assess whether the crime for which defendant has been convicted adequately describes his conduct when the conviction is for a lesser included responsive offense to the crime charged.” Id., 09-1404; 48 So.3d at 1078 (citing State v. Lanclos, 419 So.2d 475, 478 (La.1982)). This general sentencing principle accommodates Louisiana’s responsive verdict scheme which provides the fact-finder, ordinarily a jury in felony cases, the discretion to return verdicts for lesser included offenses against the weight of the evidence presented at trial. Id., 09-1404; 48 So.3d at 1078 (citing State v. Porter, 93-1106 (La.7/5/94); 639 So.2d 1137, 1140).